Filed 6/26/13  In re Z.C. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re Z.C., a Person Coming Under the Juvenile Court Law. | B243858 (Los Angeles County Super. Ct. No. CK94507) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. Y.P., Defendant and Appellant. | |

APPEAL from orders and a judgment of the Superior Court of Los Angeles County.  Daniel Zeke Zeidler, Judge.  Affirmed.

Donna Balderston Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

————————————

In this case, Y.P. (Mother) subjected Z.C., born in 2004, to years of coaching that Z.C. had been sexually, physically, and emotionally abused by Gregory C. (Father). As a result, Z.C. was hospitalized twice and diagnosed with major depressive disorder and suicidal ideation. None of the allegations against Father was substantiated. Mother appeals from the juvenile court's orders and judgment denying her request to represent herself, adjudging Z.C. a dependent of the court pursuant to Welfare and Institutions Code section 300, subdivisions (b) (failure to protect) and (c) (serious emotional damage), removing Z.C. from Mother's custody, denying reunification services to Mother, and terminating jurisdiction.[1] Mother contends that part of the custody order referring to Mother's lack of progress in court-ordered programs must be stricken because the juvenile court never ordered Mother to participate in any programs. Father is not a party to this appeal.

We conclude the juvenile court did not abuse its discretion in denying Mother's request for self-representation. Further, we conclude substantial evidence supports the court's jurisdictional findings, the custody order, and orders removing Z.C. from Mother's custody, denying Mother reunification services, and terminating jurisdiction. We affirm.

## BACKGROUND

The events leading up to the filing of the current petition are as follows. On June 14, 2012, the Los Angeles County Department of Children and Family Services (DCFS) received a referral for general neglect by Mother and general neglect and sexual abuse by Father after Mother and maternal grandmother brought Z.C. to the police department, claiming that when Z.C. was three years old, Father had sexually abused Z.C. by putting his penis, his tongue, and a comb inside Z.C.'s vagina. Mother claimed that Z.C. had attempted to choke herself with a shoestring. Mother also claimed that she had not put Z.C. in counseling because they were being "'followed'" and Z.C. was bullied at school. Maternal grandmother said that a police helicopter took pictures of

[1] Undesignated statutory references are to the Welfare and Institutions Code.

them.  Z.C. claimed that when she was three years old, Father had sexually abused Z.C. by putting his penis, his tongue, and a comb inside her vagina.  Z.C. stated that Father had committed "inappropriate acts" and that she was suicidal because of what Father had done to her.  Z.C. stated that on another occasion when she was three years old, Father had taken her to a Burger King restaurant and exposed himself to her.  She described his penis as "'having a [hole] at the tip and hair around it,'" and stated that Father shook his penis before putting it back in his pants.  DCFS opined that Z.C. appeared to be coached because her statements were not appropriate for her age and were very similar to Mother's statements.  Z.C. was detained and taken to the hospital for a medical and mental health evaluation.  Z.C. was prescribed psychotropic medications and therapy was recommended.  But Mother refused to fill the prescriptions because "they don't do studies for effects of the meds on children" and did not enroll Z.C. in therapy, claiming insurance problems.  Father denied the allegations of sexual abuse.  The allegations against Father of sexual abuse were determined to be inconclusive "due to the fact [Z.C.] continues to say the incident happened," the allegations of general neglect against Father were determined to be unfounded, and the allegations of general neglect and emotional abuse against Mother were substantiated.

Thereafter, DCFS reported that in 2007, Z.C. had been the subject of five child welfare referrals.  Three of the referrals involved Father's alleged sexual abuse of Z.C.; two of those referrals were closed as unfounded and one of them was "evaluated out as it is a secondary referral."  The remaining two referrals involved alleged physical abuse by Father and paternal grandmother; the referral as to Father was closed as unfounded and the other referral was "evaluated out as there was no abuse."  DCFS reported that as to the 2007 allegations, Mother told DCFS that she had discovered a bruise on Z.C.'s right hip.  She said Z.C. told her Father had kicked her.  Mother also stated that Z.C. cried every time she was scheduled to visit Father.  DCFS reported that Z.C. had made spontaneous statements, inconsistent statements, and statements that were inappropriate for a three-year-old child.  In the presence of Mother, Z.C. said Father had kicked her.  Later, Z.C. denied that Father had kicked her and said she had fallen on a couch.  DCFS

3

opined that Mother coached Z.C. and counselors opined that Mother was "trying to build a case against Father." DCFS noted that Z.C. appeared strongly bonded to Father.

DCFS also reported that on April 19, 2012, DCFS had received a referral alleging general neglect of Z.C. by Father and physical abuse by paternal aunt that was closed as unfounded. DCFS reported that as to the April 2012 referral, Mother had called Father "the 'devil' and 'evil'" in front of Z.C. and Z.C. told DCFS that Father had touched her inappropriately. But Z.C. was unable to provide details. Later, Z.C. told DCFS that Mother had "helped her remember" details and that she remembered Father had pulled down his pants and put her foot in the toilet at a Burger King restaurant.

DCFS also reported that on May 27, 2012, DCFS had received a referral alleging emotional abuse of Z.C. by Father that was closed as unfounded. DCFS reported that as to the May 2012 referral, Mother had brought Z.C. to a hospital claiming that Z.C. was making suicide threats, had threatened to kill her father, and had attempted to commit suicide by placing a rubber band around her neck a week earlier. At the hospital, Z.C. and Mother claimed Father had sexually abused Z.C. Mother told DCFS that at a Burger King restaurant, Father had told Z.C., "'I hate you,' and 'I want to kill you,'" causing Z.C. to become depressed and threaten to kill herself and Father. Z.C. told DCFS that Father had grabbed her, dragged her into the rest room at a Burger King restaurant and showed her his private parts, grabbed her left foot and put it in the toilet and flushed it. She stated that on another occasion, Father had touched her bottom. She stated that she hated Father and wanted to kill him. Z.C. was hospitalized and an assessment team reported its concern that Mother had waited a week to report the alleged suicide attempt and that Mother had taken Z.C. to the hospital right before she was scheduled to meet with Father for a visitation exchange. DCFS reported that as to the May 2012 hospitalization, Mother told DCFS that doctors had diagnosed Z.C. with depression and "possible PTSD," prescribed psychotropic medications, and recommended therapy. But Mother stated that she refused to administer the prescribed medications to Z.C. and claimed that she could not schedule therapy sessions because of "problems with the insurance."

4

DCFS reported that Father, who had been employed for 12 years as a pharmacy technician and was married with other children, had provided Z.C. with appropriate care. Father stated that he had never sexually abused Z.C.; nor had he ever taken her to a Burger King restaurant. Father stated that Mother thought people were following her and that he had hired a police helicopter to follow her. He believed that Mother had mental health problems. Father wanted what was best for Z.C. and stated that she could stay with paternal grandmother until she could come to his home. Father stated that when Z.C. was around three years old, a "case worker" had recommended therapy for her. Father had set up an appointment but Mother would not sign the paperwork when she found out that Father would be included in the therapy sessions. In 2009, after the family law court ordered Z.C. to be in counseling, Father filled out the paperwork, which Mother refused to sign, "so the referral was closed." In 2010, the family law court ordered Z.C. to be in counseling through her school, but Mother first said the wait list was "really long," and the next year removed Z.C. from school to home school her. Z.C. told Father that she was not being bullied at school, and Father did not agree with Mother's decision to home school Z.C. After Z.C. started being home schooled, Father noticed that she became more withdrawn, distant, and quiet. She rarely left the house.

DCFS reported that a 2009 family law judgment that gave Mother and Father joint physical and joint legal custody included the finding that Father did not sexually abuse Z.C. Neighbors told DCFS that Mother, maternal grandmother, and Z.C. stayed indoors, only leaving the home to go to the store. When they left the house they were "all covered up" "and the child [was] covered or under the stroller."

Mother did not attend a team decisionmaking meeting (TDM) on June 29, 2012. At a subsequent TDM on July 3, 2012, Mother stated that during Z.C.'s two hospitalizations, doctors had recommended therapy and medication for Z.C. Mother did not want Z.C. to be on medication and said she could not enroll Z.C. in therapy because she had no money. Mother declined to have an "upfront assessment and forensic [exam]" for Z.C. She did not agree to the plans made during the TDM. A psychiatrist at the TDM recommended therapy for Z.C. and an evaluation for Mother.

Subsequently, Father arranged for Z.C.'s therapy through his health insurance, but Mother refused to consent. DCFS obtained a removal warrant on July 6, 2012. With the assistance of the police, DCFS detained Z.C. from Mother's care. Mother and maternal grandmother had locked the door, refused to allow the police to enter, screamed at the police, and upset Z.C. Mother eventually brought Z.C. out of the house, first covering their faces with their hair. Z.C. calmed down when DCFS drove her to paternal grandparents' home. On July 8, 2012, Mother attempted to file a missing persons report and was instructed by the police to contact DCFS.

On July 11, 2012, DCFS filed a petition on behalf of Z.C. As sustained, paragraph b-1 of the petition alleged under section 300, subdivision (b) that Z.C. was diagnosed with major depressive disorder and suicidal ideation and hospitalized in June 2012. Mother had failed to provide recommended mental health treatment for Z.C. for five years and refused to allow Father to obtain mental health treatment for Z.C. As sustained, paragraph b-2 of the petition alleged under section 300, subdivision (b) that Mother created a detrimental situation for Z.C. by making numerous unsubstantiated referrals of sexual, physical, and emotional abuse against Father. As sustained, paragraph c-1 of the petition alleged under section 300, subdivision (c) that Mother emotionally abused Z.C. by "relentlessly" attempting to convince Z.C. that Father sexually abused Z.C. when she was three years old, constantly speaking negatively of Father to Z.C., and removing Z.C. from school to home school her, depriving her of contact with the outside world.

At the July 11, 2012 detention hearing, the juvenile court appointed counsel for Mother. Mother's counsel, Joseph Lee, informed the court that Mother wanted to represent herself. The court provided Mother with an advisement and waiver of right to counsel form (waiver form). During a break in the proceedings, Mother filled out a portion of the waiver form, indicating that she had graduated from high school, had no other formal education, and had been employed in customer service and retail jobs. She also stated at section 4 of the waiver form that she understood the allegations against her to be "[d]eclining to get health insurance for my child or therapy. Putting my child in

6

home school." Although Mother checked and initialed the boxes regarding the dangers and disadvantages of self-representation, she did not check or initial the box stating that she understood that the petition would be filed and become part of the file, would be forwarded to the Court of Appeal if there were future writ or appellate proceedings, and would be considered in determining whether she knowingly and intelligently waived her right to legal counsel. Mother also did not check and initial the box acknowledging that she understood all that she had read and all the court had told her, wanted to be granted permission by the court to proceed in propria persona, and understood that by making the request she was giving up the right to be represented by a lawyer.

Upon resuming the proceedings, the court asked Mother if she understood that her parental rights could be terminated and that Z.C. could be adopted. Mother replied, "I do now. I didn't know it before." When asked, she stated that she understood that the court could issue a new custody order limiting any parent's rights, including a no-contact order. When asked if she understood that "the law we're dealing with is all summarized in this giant book" and the attorney representing DCFS had 20 years of experience, Mother replied, "Now I do, your Honor," and that she thought she still wanted to represent herself because "[m]y mother instinct tells me to." Because Mother stated she had not read the entire petition, the court called a recess to give her time to finish reading it. When the proceedings resumed, Mother stated that she had not read the petition and reports "thoroughly," "but . . . did go through parts of it." Mother then affirmed that she wanted to represent herself. The court then stated, "I'm denying your request for a couple of reasons. One, if you are not going to adequately prepare, you are not going to be able to represent yourself. And as far as I know, you were ready to come back in. Did you need more time, or did you just read it to the extent that you wanted to read it?" Mother replied that she needed more time. The court asked if she was reading the documents when she was called back into the courtroom. Mother replied, "No, not just now." The court then stated, "So the mother is not preparing. Secondly, the mother's understanding of the petition is not accurate and adequate. The mother says her understanding of the petition alleges the following with respect to her, quote, 'declining

7

to get health insurance for my child or therapy, putting my child in home school.' [¶] And it's very clear to the court that that is not an adequate understanding of the petition which alleges—I'm not going to go into the petition out loud and in detail, but it's very clear that that is not an adequate understanding of the nature of the allegations against her from having on her own tried to represent herself. [¶] It is very rare for me to deny parents' requests to be self-represented. I have had some of the most difficult schizophrenic parents be self-represented with no problem. But in this case where the mother is not adequately understanding the possible consequences before going pro per— first asked me to go pro per, not understanding the seriousness enough to adequately prepare before coming into the courtroom and not adequately understanding the nature of the allegations and reviewing the petition herself, the court is denying the mother's request to be self-represented."

The juvenile court then confirmed Mr. Lee as Mother's appointed counsel. Later, the court stated, "One other thing I want to point out on the denial of the mother's request to be self-represented the last time we went on record and I told the mother to finish reading the petition and the documents and to add anything to the advisement and waiver of right to counsel form and the reason I was specifically doing that was because of section 4 on that form of her understanding of the petition. [¶] When we went off the record, she asked Mr. Lee to help her fill out the form since she had filled it out and thought it was complete. Mr. Lee explained that he wanted to be her attorney but he's not her attorney and he's not going to help her fill out the forms showing that she doesn't need an attorney and that she understands all of that. So I did have Mr. Lee specifically point out to the mother that the thing I was concerned about was that section 4 of the waiver form so she would know exactly where I—what I wanted her to consider adding to once she had finished reviewing the petition."

The juvenile court ordered Z.C. detained from Mother, monitored visits for Mother, family reunification services and no- and low-cost referrals for recommended programs for Mother, Z.C. released to Father, and family maintenance services for Father. The court ordered DCFS to assist Father in scheduling individual counseling and

a psychotropic medication evaluation for Z.C. Subsequently, DCFS obtained Father's consent for Z.C. to be placed in therapy and recommended that family reunification services be provided to Mother, including parent education, individual counseling with a licensed therapist, conjoint counseling with Z.C. when deemed appropriate by Z.C.'s therapist, a psychological or psychiatric evaluation, and to comply with treatment as recommended.

At the August 15, 2012 jurisdictional hearing, Mother's counsel informed the court that Mother wanted to represent herself. Mother was not in the courtroom at the time. The court noted it was concerned about her request because she had been very late to court and she had left to go to the cafeteria just as the court was ready to address her request for self-representation. When Mother appeared, the court asked if she wanted a different attorney or wanted to represent herself. She stated that she wanted to represent herself because she had spoken primarily to the paralegal and to the attorney only once or twice and because her attorney had told her he would not be able to "win the case because of the amount of time that has passed, because he just received the paperwork that— the proof about two days ago." When questioned further, Mother stated that she wanted a different attorney. The court then relieved her counsel. Mother then stated, "You know what? I'm sorry, your Honor. Actually, I'll just represent myself. I have all of my evidence with me. I might as well just represent myself. I just wish it would have been like this from the very beginning. Because I feel like we've wasted so much time. I'm here on the stand being accused of something I didn't even do. I have no shame here. I have nothing, nothing to be afraid of . . . [¶] . . . [¶] I just need my child back as soon as possible." The court noted, "For the record, I said 'just a minute' because I wanted to go into chambers to get the advisement and waiver-of-rights-to-counsel forms. And after I said 'just a minute,' stood up, and I was walking to the door, the mother was still speaking or more so rambling." The court vacated its order relieving Mother's counsel. The court also noted that Mother had just said to the bailiff that she did not know how to fill out the form and needed help. When Mother argued that she had represented herself

9

previously in family court, the court pointed out that family court was different from dependency court.

The juvenile court then conducted a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*). After conducting the *Marsden* hearing, the court stated it had denied Mother's request to relieve her present counsel and appoint new counsel. It also denied Mother's request for self-representation. No parties responded when the court asked if any parties were not ready to proceed to adjudication.

The juvenile court admitted DCFS's reports into evidence. Mother's counsel attempted to introduce 33 exhibits into evidence, which were objected to on the basis of lack of foundation, hearsay, relevance, and timeliness. One exhibit consisted of letters purportedly written by Z.C. and addressed to the court. The court admitted two of Mother's exhibits that were copies of hospital "service" summaries, noting that "some of the mother's evidence, as shown by those two things, actually was admitted." It sustained the objections to 31 of the exhibits, stating that all counsel had declared "ready," Mother's counsel knew that the other parties would object to the timeliness of the exhibits, and Mother "emphasized earlier today that she did not want any further continuances and wanted to proceed today."

Mother testified as follows. Z.C. first told Mother on June 9, 2007, that she had been sexually abused by Father. Z.C. told her that Father had stuck his tongue and a comb into her vagina. Z.C. told Mother that at a Burger King restaurant, Father had taken her into the women's bathroom where he exposed his penis to her, put her foot inside the toilet, and told her that he hated her and wanted to kill her. Z.C. behaved aggressively, threw tantrums, screamed, drew pictures of penises, and rubbed her Barbie dolls in a sexual manner. Z.C. masturbated frequently and sometimes put her head close to Mother's vaginal area. Z.C. had a history of vaginal discharge, odor, and itchiness for which she was prescribed medications. Although doctors advised Mother that Z.C. was exhibiting unusual and inappropriate behavior, the doctors did not make any reports to the police. Mother reported Father's sexual abuse of Z.C. to the police once and to DCFS twice. Mother did not inform the family law court of any incidents of sexual abuse or

10

Z.C.'s unusual behavior because "he really didn't want to listen to me." Mother denied that doctors had recommended Z.C. receive mental health treatment before she was hospitalized for threatening to kill herself. Later, she stated that DCFS had recommended mental health treatment when Z.C. was three years old. In 2007, Mother tried to get mental health treatment for Z.C. after she told Mother of the abuse. Mother was unable to put Z.C. into therapy for a number of reasons, including Z.C.'s age, insurance issues, and because the school district declined to treat her. Mother removed Z.C. from public school because she was being bullied. Mother had been in the "middle" of trying to put Z.C. into therapy when Z.C. was removed from her custody. Mother refused to give psychotropic medications to Z.C. as prescribed by doctors who had diagnosed her with depression because Mother was "afraid" and did not understand the side effects of the drugs. A psychologist told Mother that Mother could see how Z.C. responded to therapy before administering medications to her. Father had never attempted to get mental health treatment for Z.C. Mother also stated that she had never turned down Father's offer to help her obtain mental health services for Z.C. Mother believed that Z.C. seemed withdrawn, isolated, and "dim" after having been in therapy and on psychotropic medications.

Z.C. testified as follows. When she was three years old, Father had touched her inappropriately and she told Mother about a week later. That was the only time he touched her inappropriately. She denied ever going to Burger King with Father. Later, she testified that Father had put her foot in the toilet at Burger King. She was being home schooled because she had been bullied at school. She tried to choke herself with a rubber band because she was angry that she was "telling everybody the truth, and they still didn't do anything." She did not want to live with Father because she was "mad" and "because he went and touched me inappropriate[ly] when I was little," but could not remember details such as if Father and Z.C. were clothed at the time. She denied that Father ever gave her a bath. She denied writing letters to the court.

The juvenile court noted that Mother "only wanted [Z.C.] to get mental health treatment from someone who was going to support her view of things." Additionally,

11

Z.C. was very vague about the incident that had allegedly occurred when she was three years old and could not give details or explain why Father's purported touching was inappropriate. Further, there were no reports of problems on visits with Father.

The juvenile court adjudged Z.C. a dependent child of the court and proceeded to disposition. Mother's counsel requested that the court grant Mother sole legal and physical custody of Z.C., or in the alternative that the case remain open for Mother to receive family reunification services. DCFS requested that the court maintain jurisdiction. Upon being questioned by the court, DCFS stated that under Father's custody, Z.C. had received therapy and that Z.C.'s therapeutic needs had been met. Although Z.C.'s counsel also requested that the court maintain jurisdiction, counsel confirmed that Z.C. was not currently residing with Father, who had an appropriate plan in place. The court removed custody from Mother and placed Z.C. "home of Father." The court terminated jurisdiction, granting Father legal and physical custody. The court ordered Mother to have weekly monitored visits to be paid for by Mother, Father to ensure that Z.C. continue in individual counseling and any recommended psychiatric care, and Father to participate in any conjoint counseling recommended by Z.C.'s therapist. The court did not grant Mother reunification services "because [Z.C.] is safely in the care of another parent. In order for the mother to work up to unmonitored visits she still needs to make substantial progress in having a mental health assessment, and individual therapy with a licensed therapist, a psychiatric assessment, and following any recommendations of a psychiatrist, parenting education." The court further stated that "this case really has to do with the mother's psychiatric issues that don't appear to have even been addressed, let alone identified appropriately and/or treated. And that's why the mother needs a mental health assessment and a psychiatric assessment."

An addendum to the order stated, "Supervised visitation is ordered for [Z.C.] as the mother [¶] has not made substantial progress regarding the following court ordered programs: [¶] parenting classes [¶] . . . mental health assessment; individual counseling with a licensed therapist; Psychiatric assessment [and] follow recommendations of the Psychiatrist." The court stayed termination of jurisdiction until August 17, 2012, for

12

receipt of the family law custody order. The family law custody order was received on August 17, 2012, and the stay was lifted. Mother appealed.

## DISCUSSION

**A. The juvenile court did not abuse its discretion in denying Mother's request for self-representation**

Mother contends that the juvenile court abused its discretion in denying her request for self-representation. We disagree.

"Section 317, subdivision (b) requires appointment of counsel for an indigent parent or guardian in a juvenile dependency case 'unless the court finds that the parent or guardian has made a knowing and intelligent waiver of counsel as provided in this section.' A waiver of counsel is valid if the juvenile court has apprised the parent of the dangers and disadvantages of self-representation and the risks and complexities of his or her particular case. [Citation.] [¶] Section 317, subdivision (b) has been interpreted to give a parent in a juvenile dependency case a statutory right to self-representation. (*In re Angel W.* (2001) 93 Cal.App.4th 1074, 1083 (*Angel W.*).) This right is statutory only; a parent in a juvenile dependency case does not have a constitutional right to self-representation. (*Id.* at p. 1082.)" (*In re A.M.* (2008) 164 Cal.App.4th 914, 923.) "The state will only interfere with an individual's choice of legal representation when that choice 'will result in significant prejudice' to the individual 'or in a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case.' [Citation.]" (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 256.) "Thus, the juvenile court has discretion to deny the request for self-representation when it is reasonably probable that granting the request would impair the child's right to a prompt resolution of custody status *or* unduly disrupt the proceedings." (*In re A.M.*, *supra*, 164 Cal.App.4th at pp. 925–926.) "The child's right to a prompt resolution of custody exists and must be respected at every step of the juvenile dependency proceedings. Accordingly, while '[a] parent may waive counsel at any point' (*Angel W.*, *supra*, 93 Cal.App.4th at p. 1083), at any point at which the waiver of counsel and request for self-representation are made, the

13

juvenile court must consider their effect on the child's right to a prompt resolution of the dependency proceedings." (*In re A.M.*, *supra*, 164 Cal.App.4th at p. 926.)

In *In re A.M.*, the juvenile court did not abuse its discretion in denying the father the right to self-representation. There, the father had resisted complying with the court order requiring him to provide documentation of his health problems to support his requests for continuances; for a year the father had resisted a court order to return the minor's passport and personal items; the father had made lengthy statements that often digressed into irrelevant matters; and the father's counsel stated it would take a year of preparation to handle the case as the father demanded. (*In re A.M.*, *supra*, 164 Cal.App.4th at pp. 927–928.) Thus, the evidence showed that allowing the father to represent himself would cause significant delay and such delay would impair the minor's right to a prompt resolution of custody status. (*Ibid.*)

Mother claims the juvenile court abused its discretion in refusing her request for self-representation because she waived her statutory right to counsel, she was mentally capable, there was insufficient evidence that there would have been delay or disruption of the proceedings, and there would have been no "impairment" in the prompt and fair resolution of Z.C.'s custody status. We disagree. The evidence supports the conclusion that Mother did not make an intelligent and knowing waiver. Mother did not fill out the waiver form completely, including failing to check the boxes indicating that she understood the waiver form would be part of the court file, she understood everything she had read and what the court told her, and she wanted to give up the right to a lawyer. And she asked both the attorney who was appointed for her and the bailiff for assistance in filling out the waiver form. Mother did not understand the petition alleged that she had made numerous unsubstantiated referrals of sexual, physical, and emotional abuse against Father, failed to get mental health treatment for Z.C. for five years, emotionally abused Z.C. by "relentlessly" attempting to convince Z.C. that Father sexually abused Z.C., and deprived Z.C. of contact with the outside world by home schooling her. Rather, she described the allegations as "[d]eclining to get health insurance for my child or therapy. Putting my child in home school." And Mother's response that she had not known

14

"before" that her parental rights could be terminated indicated an incomplete grasp of the dependency proceedings. Further, upon being given more time to read the petition, Mother stated that she had not read all of it, but also said she had not been reading the petition when she was called back into the courtroom. We agree with the court that Mother did not understand the consequences of the proceedings, did not adequately prepare, and did not understand the nature of the allegations after partially reviewing the petition. Although Mother argues on appeal that a continuance to allow Mother to prepare her defense and subpoena witnesses would not have denied Z.C. a prompt resolution of her custody status, the court noted that Mother had indicated that she wanted the adjudication to proceed that day. She cannot argue otherwise now. Accordingly, substantial evidence supports the conclusion that Mother's waiver was not knowing and intelligent and that allowing her to represent herself would cause her prejudice.

Additionally, the juvenile court noted that after it told Mother to wait while it retrieved the waiver form, Mother continued to talk in a rambling manner as the judge walked out the courtroom door to chambers. Mother's lengthy statements during her plea for self-representation, lack of preparedness, lack of understanding of the allegations, and lack of understanding of the consequences supported the conclusion that allowing her to represent herself would cause significant delay and such delay would impair Z.C.'s right to a prompt resolution of custody status. (See *In re A.M.*, *supra*, 164 Cal.App.4th at p. 927.)

In any event, any error in denying Mother's request for self-representation was harmless. (*In re A.M.*, *supra*, 164 Cal.App.4th at p. 928 [harmless error where father found not credible, was represented by competent counsel, did not explain what additional information he could have elicited from witnesses, and it was not reasonably probable he could have conducted better cross-examination of witnesses]; *People v. Watson* (1956) 46 Cal.2d 818, 837.) At the adjudication, Mother had the opportunity to present her version of the events and testified at length as to Z.C.'s alleged sexual abuse by Father and Mother's efforts to protect Z.C. and obtain therapy for her. But the court

15

found Mother not credible. Mother's counsel also called Z.C. as a witness, whom the court found not credible. Mother was represented by competent counsel, and we are not convinced that she would have done a better job getting her exhibits admitted, giving a chronological presentation of her evidence, objecting to DCFS's reports, and cross-examining the "makers of hearsay statements" in DCFS's reports. And as the court noted, some of her evidence had been admitted through two hospital summaries. It is not reasonably probable that Mother would have obtained a more favorable result if the court had granted her request for self-representation.

We conclude the juvenile court did not abuse its discretion in denying Mother's request for self-representation.

## B. Substantial evidence supports the juvenile court's jurisdictional findings

Mother contends that substantial evidence did not support the juvenile court's jurisdictional findings. We disagree.

### 1. Standard of review

The juvenile court's jurisdictional finding that the minor is a person described in section 300 must be supported by a preponderance of the evidence. (§ 355; Cal. Rules of Court, rule 5.684(f).) "'"When the sufficiency of the evidence to support a finding or order is challenged on appeal, the reviewing court must determine if there is any substantial evidence, that is, evidence which is reasonable, credible, and of solid value to support the conclusion of the trier of fact. [Citation.] In making this determination, all conflicts [in the evidence and in reasonable inferences from the evidence] are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. [Citation.]"' [Citation.] While substantial evidence may consist of inferences, such inferences must rest on the evidence; inferences that are the result of speculation or conjecture cannot support a finding. [Citation.]" (*In re Precious D.* (2010) 189 Cal.App.4th 1251, 1258–1259.)

### 2. The section 300, subdivision (b) allegations

Section 300, subdivision (b) provides a basis for juvenile court jurisdiction if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious

16

physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left . . . ."

"A jurisdictional finding under section 300, subdivision (b) requires: "'(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the child, or a 'substantial risk' of such harm or illness." [Citation.]' [Citations.] The third element 'effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur).' [Citation.]" (*In re James R.* (2009) 176 Cal.App.4th 129, 135.)

We determine that substantial evidence supported the juvenile court's findings as to paragraph b-1 of the petition that alleged under section 300, subdivision (b) that Mother had failed to provide recommended mental health treatment for Z.C. for five years and refused to allow Father to obtain mental health treatment for her. At a TDM on July 3, 2012, Mother stated that during Z.C.'s two hospitalizations, doctors had recommended therapy and medication for Z.C., but she did not follow the recommendations. At the same meeting, Mother declined to have an "upfront assessment and forensic [exam]" for Z.C. When Z.C. was around three years old, Father had set up an appointment for therapy, but Mother would not sign the paperwork when she found out that Father would be included in the therapy sessions. In 2009, after the family law court ordered Z.C. to be in counseling, Mother refused to sign the necessary paperwork. And in 2010, Mother did not put Z.C. in counseling at school. Thereafter, Mother removed Z.C. from school and home schooled her. Subsequently, Z.C. made threats to kill herself and Father and allegedly attempted suicide. Thereafter, Z.C. was hospitalized twice and diagnosed with major depressive disorder and suicidal ideation. Accordingly, substantial evidence supported the juvenile court's findings.

We also conclude that substantial evidence supported the juvenile court's findings as to paragraph b-2 of the petition that alleged under section 300, subdivision (b) that

17

Mother created a detrimental situation for Z.C. by making numerous unsubstantiated referrals of sexual, physical, and emotional abuse against Father. No allegations of sexual, physical, and emotional abuse were ever substantiated against Father. Yet Mother made three unsubstantiated referrals of sexual abuse against Father in 2007. As to those referrals, DCFS concluded that Mother had coached Z.C. and counselors reported that Mother was "trying to build a case against Father." Mother made more allegations of sexual abuse in 2012, which were also determined to be unfounded. DCFS again concluded that Mother was coaching Z.C. because, with respect to the alleged incident at Burger King, Z.C. stated that Mother had "helped her remember" the details of the sexual abuse, and at subsequent interviews, Z.C. provided more details that were age-inappropriate and were similar to details that Mother had provided. Subsequently, Z.C. made threats to kill herself and Father and allegedly attempted suicide. As a result of Mother's actions, Z.C. was subjected to numerous interviews and examinations, required to testify, hospitalized, and diagnosed with major depressive disorder and suicidal ideation.

Accordingly, we conclude that substantial evidence supported the juvenile court's findings under section 300, subdivision (b).

### 3. *The section 300, subdivision (c) allegation*

A child may be adjudged a dependent child of the juvenile court if the court finds under section 300, subdivision (c) that "[t]he child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian or who has no parent or guardian capable of providing appropriate care."

We conclude that substantial evidence supported the juvenile court's findings as to paragraph c-1 of the petition that alleged under section 300, subdivision (c) that Mother emotionally abused Z.C. by "relentlessly" attempting to convince Z.C. that Father sexually abused Z.C. when she was three years old, constantly speaking negatively of

18

Father to Z.C., and removing Z.C. from school to home school her, depriving her of contact with the outside world.

Mother called Father "the 'devil' and 'evil'" in front of Z.C. Over the course of years, she coached Z.C. to report false incidents of sexual, physical, and emotional abuse by Father. Z.C. told DCFS that Mother had "helped her remember" the alleged sexual abuse that occurred when she was three years old. Mother reported false charges of sexual, physical, and emotional abuse prior to Z.C.'s scheduled visits with Father, resulting in Z.C.'s threats to kill herself and Father and the hospitalization and diagnosis of Z.C. with major depressive disorder and suicidal ideation. And rather than seeking therapy for Z.C. and administering prescribed medications, Mother took Z.C. out of public school to home school her and rarely took her out of the house, resulting in Z.C. becoming isolated, withdrawn, and distant.

Accordingly, we conclude that substantial evidence supported the juvenile court's findings pursuant to section 300, subdivision (c).

## C. Substantial evidence supports the juvenile court's order removing Z.C. from Mother's custody

Mother contends that substantial evidence did not support the juvenile court's order removing Z.C. from Mother's custody because there were reasonable means by which Z.C. could have remained safely in Mother's custody. We disagree.

Section 361 provides, in pertinent part, "(c) A dependent child may not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody. . . . [¶] . . . [¶] (3) The minor is suffering severe emotional damage, as indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior toward himself or herself or others, and there are no reasonable means by which

19

the minor's emotional health may be protected without removing the minor from the physical custody of his or her parent or guardian." (§ 361, subd. (c)(1), (3).)

"'A removal order is proper if it is based on proof of parental inability to provide proper care for the minor and proof of a potential detriment to the minor if he or she remains with the parent. [Citation.] The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. [Citations.]' [Citation.] . . . [¶] On appeal from a dispositional order removing a child from her parent, we apply the substantial evidence standard of review, keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence. [Citation.]" (*In re Noe F.* (2013) 213 Cal.App.4th 358, 367.)

We conclude that substantial evidence supported the juvenile court's order removing Z.C. from the custody of Mother. Mother made numerous unsubstantiated allegations of sexual, physical, and emotional abuse against Father. Mother coached Z.C. to support her allegations of sexual, physical, and emotional abuse. As a result of Mother's actions, Z.C. was subjected to numerous interviews and examinations, required to testify, hospitalized, and diagnosed with major depressive disorder and suicidal ideation. Z.C. made threats to kill herself and Father and allegedly attempted to commit suicide. Mother did not acknowledge her role in contributing to Z.C.'s mental health issues, did not comply with medication instructions, refused to obtain therapy for Z.C., and thwarted Father's efforts to put Z.C. in therapy. We disagree with Mother's argument that the order should be reversed because Z.C. "could have remained at home and received therapy." Mother's failure to comply with medication and therapy recommendations and lack of cooperation with DCFS, including refusing to agree to a treatment plan and refusing to turn Z.C. over to DCFS without police involvement, persuades us that there were no reasonable means to protect Z.C. without removal.

Therefore, we conclude that substantial evidence supported the juvenile court's finding that there would be a substantial danger to the physical and emotional health of Z.C. if she were returned to Mother and there were no reasonable means by which Z.C.'s

20

physical and emotional health could be protected without removing her from Mother's custody.

## D. The juvenile court did not abuse its discretion in terminating jurisdiction and not ordering reunification services for Mother and maintenance services for Father

Mother contends that the juvenile court abused its discretion in terminating jurisdiction and not ordering reunification services for Mother and maintenance services for Father. We disagree.

"We normally review the juvenile court's decision to terminate dependency jurisdiction and to issue a custody (or 'exit') order pursuant to section 362.4 for abuse of discretion [citation] and may not disturb the order unless the court ""'exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations].'"" [Citations.]" (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.)

We conclude that the juvenile court did not abuse its discretion in terminating jurisdiction and not ordering reunification services for Mother and maintenance services for Father. First, Father does not appeal the order terminating jurisdiction or any lack of maintenance services for him, and Mother does not have standing to appeal orders as to him. Second, as to the orders relating to Mother, we note that the court confirmed that under Father's custody, Z.C. had received therapy and that Z.C.'s therapeutic needs had been met. And although Z.C. had not been residing with Father, he had an appropriate plan in place. Because Z.C. was receiving adequate care in the custody of Father, we conclude the court did not abuse its discretion in terminating jurisdiction and granting Father legal and physical custody. The court explained its reasons for not granting Mother reunification services as "[Z.C.] is safely in the care of another parent. In order for the mother to work up to unmonitored visits she still needs to make substantial progress in having a mental health assessment, and individual therapy with a licensed therapist, a psychiatric assessment, and following any recommendations of a psychiatrist, parenting education." The court ordered Mother to have weekly monitored visits to be paid for by Mother, Father to ensure that Z.C. continue in individual counseling and any

21

recommended psychiatric care, and Father to participate in any conjoint counseling recommended by Z.C.'s therapist. Nor do we agree with Mother that the court abused its discretion in requiring Mother to pay for monitored visits. Although Mother contends that the order was a "harsh condition," Mother does not establish that she requested assistance in paying for monitored visits or that she lacked the means to do so.

Accordingly, we conclude that the juvenile court did not abuse its discretion in terminating jurisdiction and not ordering reunification services for Mother.

**E. The custody order was supported by the record**

Mother contends that part of the custody order referring to Mother's lack of progress in court-ordered programs must be stricken because the juvenile court never ordered Mother to participate in any programs.

On July 11, 2012, the juvenile court ordered DCFS to provide Mother with family reunification services and no- and low-cost referrals for recommended programs. DCFS recommended that family reunification services be provided to Mother, including parent education, individual counseling with a licensed therapist, conjoint counseling with Z.C. when deemed appropriate by Z.C.'s therapist, a psychological or psychiatric evaluation, and to comply with treatment as recommended.

At the hearing on August 15, 2012, the court noted that "[i]n order for the mother to work up to unmonitored visits she still needs to make substantial progress in having a mental health assessment, and individual therapy with a licensed therapist, a psychiatric assessment, and following any recommendations of a psychiatrist, parenting education." The court further stated that "this case really has to do with the mother's psychiatric issues that don't appear to have even been addressed, let alone identified appropriately and/or treated. And that's why the mother needs a mental health assessment and a psychiatric assessment."

Accordingly, we conclude that the custody order was supported by the record: "Supervised visitation is ordered for [Z.C.] as the mother [¶] has not made substantial progress regarding the following court ordered programs: [¶] parenting classes [¶] . . .

22

mental health assessment; individual counseling with a licensed therapist; Psychiatric assessment [and] follow recommendations of the Psychiatrist."

## DISPOSITION

The juvenile court's jurisdiction and disposition orders and the judgment are affirmed.

NOT TO BE PUBLISHED.


                                          MALLANO, P. J.

We concur:


ROTHSCHILD, J.


JOHNSON, J.