[No. B238278. Second Dist., Div. One. Jan. 16, 2013.]

In re NOE F., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Appellant, v.
EMMA M., Defendant and Appellant;
NOE S., Respondent.

## COUNSEL

John F. Krattli, County Counsel, and Kim Nemoy, Principal Deputy County Counsel, for Plaintiff and Appellant.

Michelle L. Jarvis, under appointment by the Court of Appeal, for Defendant and Appellant.

Linda S. Rehm, under appointment by the Court of Appeal, for Respondent.

## OPINION

**JOHNSON, J.**—Emma M. (Mother) challenges the dependency court's jurisdictional and dispositional orders finding she was unable to arrange for her child Noe F.'s (Noe) care after Mother was arrested and incarcerated on a gang-related offense. She contends that insufficient evidence supports the allegation under Welfare and Institutions Code section 300, subdivision (b)[1] that she was not able to protect Noe because Mother was incarcerated and failed to make arrangements for Noe's care. She further argues that the dependency court erred in giving Noe S. (Father) custody of Noe without making the findings required under section 361.2 regarding placement with Father. The Los Angeles County Department of Children and Family Services (DCFS) cross-appeals, and filed a letter brief in which it does not concede error, but stated it does not oppose a reversal of the court's jurisdictional and dispositional orders. We reverse.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Mother, born in April 1991, is an active member of the Compton Varrio Segundo gang. Father, born in March 1992, is a member of the same gang, and at the time of Noe's detention, was incarcerated for two counts of attempted murder. Noe was born in November 2010, and was 10 months old at the time of detention.

On September 29, 2011, the Los Angeles County Sheriff's Operation Safe Streets (OSS) team executed a search warrant at an address in Compton relating to several assaults with a deadly weapon that had occurred in Paramount. One of the warrants pertained to Mother, who was believed to be a coconspirator in an attempt to dissuade witnesses from testifying in court.

---

[1] All statutory references herein are to the Welfare and Institutions Code unless otherwise noted.

Mother was arrested and placed in a patrol car. During a search of the home, sheriffs found children in the home, and contacted DCFS's multiagency response team (MART) and requested MART to investigate the welfare of the children found in the home. Mother claimed she did not know why the police had come to her house, and denied being engaged in any criminal or gang activity. Mother told the social worker she lived at the house, which belonged to Griselda S. (paternal grandmother). Paternal grandmother's boyfriend Mauricio R. (Mauricio) also lived there. Although Mother knew Father was incarcerated, she claimed not to know why, and claimed he no longer associated with a gang.

Mother denied any substance abuse or mental health history. Mother was Noe's primary caregiver, and she did not work. When asked who could care for Noe due to Mother's arrest, Mother identified her preferences: DCFS should ask paternal grandmother if she could care for Noe; if paternal grandmother could not, then Mother's own mother, Teresa M. (maternal grandmother), could care for Noe. Mother told DCFS that maternal grandmother's house had been raided in the past. Paternal grandmother stated that she had a child with Mauricio named Alex, and she had been renting a room to Mother for a couple of months. Paternal grandmother stated that Father was incarcerated on charges that were unfounded. When asked whether she could care for Noe, paternal grandmother responded that she worked during the day and her live-in boyfriend worked at night, she had her own child, and could not care for Noe. Paternal grandmother suggested placing Noe with maternal grandmother. Mauricio reiterated that he and paternal grandmother could not care for Noe.

Noe was happy and in good health. Given the situation, DCFS took Noe into protective custody based on Mother's and Father's inability to provide for his care. The next day, maternal grandmother expressed her desire to have Noe placed with her.

DCFS learned that the family had previous DCFS history. In March 2011, a referral alleged that Noe was the victim of severe neglect based on an incident in which a rival gang member (who lived near Father) came to maternal grandmother's house and shot at the back of Father's car. The case was closed as unfounded.

Further, in February 2001, maternal grandmother's nine-month-old child died as the result of physical abuse at the hands of maternal grandmother's boyfriend Leandro G. DCFS concluded that maternal grandmother was unaware of the abuse, and DCFS found that allegations of maternal grandmother's abuse of Mother and her sibling Manuel were unfounded. A June 2007 referral that maternal grandmother had hit Mother with a belt was found

to be unsupported, and DCFS concluded there was no need for continued intervention as the children were not at risk of harm. Maternal grandmother had a 1993 conviction for petty theft for which she received one year of probation and a fine.

In October 2005, an unfounded referral was made regarding maternal grandmother's child Gabriel.

Father had a criminal background dating back to 2006 that included petty theft, possession of an unregistered firearm, possession of ammunition, and vandalism. Father was either released to his parents or received probation for these charges. Father's most recent charge was the pending charge for two counts of attempted murder. Mother's criminal history disclosed charges for robbery, theft, and failure to appear. Father was currently incarcerated at Men's Central Jail.

The petition filed October 4, 2011, against Mother and Father alleged failure to protect and no provision for support (§ 300, subds. (b), (g)) based upon Mother's and Father's failure to make provision for Noe's care upon their incarceration.

At the detention hearing held October 4, 2011, the court ordered a prerelease investigation for maternal grandmother, and found a prima facie case for Noe's detention.

DCFS's October 12, 2011 prerelease investigation report stated that Noe was placed in foster care. Mother told DCFS she wanted Noe placed with maternal grandmother. If Noe could not be placed with maternal grandmother, Mother's wanted him placed with her aunt Julia M. (maternal great-aunt) or a paternal aunt and uncle, Irene and David L.

Maternal grandmother informed DCFS she had been babysitting Noe since his birth. Maternal grandmother was a stay-at-home mother who cared for her two special needs children (Omar, age seven, and Samuel, age nine). Both children attended school. Samuel had a speech delay, and Omar was autistic. Maternal grandmother was Catholic and attended church every two months, and was in the process of moving to a new home in Moreno Valley. Maternal grandmother was financially able to provide for the children, and denied using corporal punishment. She stated she would assist in Mother's and Father's reunification and visitation. Maternal grandmother currently resided in a two-bedroom, one-bath home. The home was clean and appropriately furnished, with functioning smoke detectors. The backyard was fenced and appropriate for children. DCFS could not recommend release to maternal grandmother without a waiver of her criminal history.

At the October 12, 2011 prerelease hearing, the court requested DCFS to assess possible placement with Noe's maternal great-aunt and to obtain waivers of maternal grandmother's criminal history, and continued the matter to October 26, 2011, for a pretrial resolution conference.

DCFS's last-minute information stated that the social worker had completed the home assessment of maternal great-aunt at her home in Buena Park. Maternal great-aunt worked full-time at Amway in shipping and receiving, and lived in a one-story house with her adult son Carlos and her high-school-aged daughter. Maternal great-aunt arranged for a crib for Noe, and told the social worker Noe would be placed in daycare while she was at work. Maternal great-aunt's Live Scan was clear. DCFS filed an additional last-minute information on October 28, 2011, which provided an update on Noe's proposed daycare, establishing that it was licensed.

At the October 28, 2011 hearing, the court ordered Noe placed with maternal great-aunt. The matter was set for adjudication November 29, 2011.

DCFS's report filed November 29, 2011, for the jurisdictional hearing stated that maternal great-aunt had taken Noe to see his parents every other weekend. Mother and Father were happy to see Noe.

At the hearing, dependency investigator Jamitka Williams testified that Noe was currently placed with maternal great-aunt. Williams had spoken to four or five relatives of Mother concerning placement. Paternal grandmother had stated she did not want to care for Noe because of her work and living situation.

Mother testified that at the time of her arrest, Noe was present. She asked DCFS to assess several of her aunts and uncles for placement. She did not have any concerns about Noe's placement with maternal great-aunt, but did not want him to remain there. She believed he was better off with maternal grandmother, who was her first choice for his placement. Mother requested the court to dismiss the petition on the grounds that incarceration is not grounds for jurisdiction unless the parents are unable to arrange for the care of the child, and nothing required the parent to establish the suitability of the proposed care plan. Here, Noe had not been placed with maternal grandmother because of abuse concerns; yet the previous allegations against maternal grandmother were deemed unfounded. As a result, Mother believed maternal grandmother was an appropriate placement for Noe. Father sought dismissal of the counts alleged against him on the grounds he was incarcerated at the time. The parties stipulated that paternal grandmother was willing to take Noe. The court found that Mother had not made an appropriate plan, and sustained the allegation under section 300, subdivision (b) as to Mother,

and dismissed the other allegations against her. The court found Father was nonoffending, and dismissed the allegations against him.

DCFS's report for the dispositional hearing of December 12, 2011, stated that Noe was bonded, attached and happy in the care of maternal great-aunt. Noe attended daycare from 9:00 a.m. to 4:00 p.m. Monday through Thursday and from 9:00 a.m. to 12:00 p.m. on Friday.

At the contested disposition hearing, Noe's counsel pointed out that at the jurisdictional hearing, the court found Father to be nonoffending. Further, Father was able to make a plan to leave Noe in paternal grandmother's care, and paternal grandmother was willing to care for Noe. Counsel stated that currently, paternal grandmother's home was not approved, but she would comply with ASFA[2] standards and Noe would be able to be placed with her. Counsel requested that Father be allowed to make this plan for Noe's care. Mother's counsel joined, and asked the court to enter an order allowing both parents to make a plan for Noe's care, and asked the court to consider a home of parent order for Father.

The court granted Father custody of Noe, and ordered Father to cooperate with family maintenance services, to enroll in a parenting program, and to go to a gang diversion program. Father was given unmonitored visitation. The court ordered reunification services for Mother consisting of parenting classes, individual counseling, and monitored visitation. The court did not terminate jurisdiction. Mother objected to the home of parent order for Father, and the court stated that Father was nonoffending.

Mother timely appealed. DCFS cross-appealed.

## DISCUSSION

I. *Jurisdiction*

Mother argues that the fact that she was incarcerated was not a basis for finding that she would cause Noe serious physical harm or illness under section 300, subdivision (b) simply because she was unable to make an appropriate plan for his care based on the fact maternal grandmother previously had a child who died while in her care and the paternal grandmother had indicated she was unable to care for Noe. Mother points out that she identified several relatives for Noe's care, and Noe was eventually placed with one of the relatives she suggested. We agree.

---

[2] ASFA refers to the Adoption and Safe Families Act of 1997 (42 U.S.C. § 670 et seq.), which establishes federal guidelines for foster care and relative care placements. (*In re Darlene T.* (2008) 163 Cal.App.4th 929, 932, fn. 1 [78 Cal.Rptr.3d 119].)

At the jurisdictional hearing, the dependency court's finding that a child is a person described in section 300 must be supported by a preponderance of the evidence. (§ 355, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248 [19 Cal.Rptr.2d 698, 851 P.2d 1307]; *In re Sheila B.* (1993) 19 Cal.App.4th 187, 198 [23 Cal.Rptr.2d 482].) On appeal, in reviewing a challenge to the sufficiency of the dependency court's jurisdictional findings, our power begins and ends with a determination as to whether substantial evidence exists, contradicted or uncontradicted, supporting the dependency court's determinations. We review the evidence in the light most favorable to the dependency court's findings and draw all reasonable inferences in support of those findings. (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969 [78 Cal.Rptr.2d 311]; *In re Basilio T.* (1992) 4 Cal.App.4th 155, 168 [5 Cal.Rptr.2d 450].) Thus, we do not consider whether there is evidence from which the dependency court could have drawn a different conclusion but whether there is substantial evidence to support the conclusion that the court did draw. (*In re Rubisela E.* (2000) 85 Cal.App.4th 177, 194–195 [101 Cal.Rptr.2d 760]; *In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319 [27 Cal.Rptr.2d 595, 867 P.2d 706].)

■ "Section 300, subdivision (b) provides a basis for . . . jurisdiction if the child has suffered, or there is a substantial risk the child will suffer, serious physical harm or illness caused by the parent's inability to provide regular care for the child because of the parent's mental illness, developmental disability or substance abuse." (*In re James R.* (2009) 176 Cal.App.4th 129, 135 [97 Cal.Rptr.3d 310].) A jurisdictional finding under section 300, subdivision (b) requires "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820 [2 Cal.Rptr.2d 429].) "Subdivision (b) means what it says. Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a *substantial risk of serious physical* harm or illness." (*In re Rocco M.*, at p. 823; see *In re Alysha S.* (1996) 51 Cal.App.4th 393, 399 [58 Cal.Rptr.2d 494].)

■ Here, we find insufficient evidence supports the court's finding of jurisdiction based upon section 300, subdivision (b). Mother is correct that her incarceration, without more, cannot provide a basis for jurisdiction (*In re S. D.* (2002) 99 Cal.App.4th 1068, 1077 [212 Cal.Rptr.2d 518]). Further, Mother had identified two suitable placements for Noe: Noe's maternal grandmother and paternal grandmother. The allegations against maternal grandmother based upon the death of a child were deemed unfounded; after initially expressing her inability to care for Noe, paternal grandmother agreed that she could care for Noe. As a result, there was no basis to assert jurisdiction over Noe based upon Mother's care choices.

## II. *Removal Order from Mother and Placement with Father*

Mother contends the dependency court erred in removing Noe from her custody because it failed to follow the dictates of section 361, and similarly erred in placing Noe with Father because the court failed to make the statutorily required findings under section 361.2 when it placed Noe with the nonoffending parent.

### A. *Section 361*

■ Section 361, subdivision (c)(1), provides children "shall not be removed from the home in which they are residing at the time of the petition unless there is clear and convincing evidence of a substantial danger to the [children']s physical health, safety, protection, or physical or emotional well-being *and* there are no 'reasonable means' by which the [children] can be protected without removal." (*In re Jasmine G.* (2000) 82 Cal.App.4th 282, 288 [98 Cal.Rptr.2d 93].) "A removal order is proper if it is based on proof of parental inability to provide proper care for the minor and proof of a potential detriment to the minor if he or she remains with the parent. [Citation.] The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. [Citation.]" (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136 [98 Cal.Rptr.2d 715].) Additionally, section 361, subdivision (c)(5) provides for removal of a child from the parent's custody if the parent is incarcerated and unable to arrange for the child's care.

On appeal from a dispositional order removing a child from her parent, we apply the substantial evidence standard of review, keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence. (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654 [54 Cal.Rptr.2d 722].)

Here, for the same reason we find the court erred in sustaining the petition as to Mother, we find insufficient evidence supports removal of Noe from Mother's custody. Mother identified two suitable caregivers, Noe's grand-mothers, both of whom were willing to take the child.

### B. *Section 361.2*

Section 361.2, subdivision (a), provides in part that "[w]hen a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child."

The section provides that "[i]f that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional wellbeing of the child." (§ 361.2, subd. (a).)

■ The term " 'custody' " as used in section 361.2, refers to the parent's "right to make decisions pertaining to the child" and to have "legal possession of the child." (*In re Austin P.* (2004) 118 Cal.App.4th 1124, 1130–1131 [13 Cal.Rptr.3d 616].) " 'Placement' " refers to "where the child shall live during the dependency proceeding." (*Id.* at p. 1131.) Thus, under section 361.2, subdivision (a), the court examines whether it would be detrimental to temporarily place a child with the nonoffending noncustodial parent; under section 361.2, subdivision (b), the court decides whether that placement should be permanent and whether the court's jurisdiction should be terminated. (*In re Austin P.*, at p. 1131.)

■ In enacting subdivisions (a) and (b) of section 361.2, "the Legislature envisioned a two-step process: [First,] under subdivision (a), the court examines whether it would be detrimental to temporarily place a child with the nonoffending noncustodial parent; [second,] under subdivision (b), the court decides whether that placement should be permanent and whether the court's jurisdiction should be terminated." (*In re Austin P., supra*, 118 Cal.App.4th at p. 1131.) In assigning custody of the child to either parent, "the court's focus and primary consideration must always be the best interests of the child." (*In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268 [5 Cal.Rptr.3d 261].)

"[W]hen a noncustodial parent is incarcerated, the [dependency] court must proceed under section 361.2 to determine whether the incarcerated parent desires to assume custody of the child. Unlike section 361.5, section 361.2 does not distinguish between an offending and nonoffending parent, and the court applies section 361.2 without regard to the characterization of the parent as offending or nonoffending." (*In re V.F.* (2007) 157 Cal.App.4th 962, 965–966 [69 Cal.Rptr.3d 159].) If a noncustodial, incarcerated parent seeks custody of the child, the court must determine whether placement with that parent would be detrimental to the child's safety, protection, or physical or emotional well-being. (§ 361.2, subd. (a).) Among the factors in determining detriment are the noncustodial, incarcerated parent's ability to make appropriate arrangements for the care of the child and the length of that parent's incarceration. (*In re S. D., supra*, 99 Cal.App.4th at p. 1077; *In re Isayah C.* (2004) 118 Cal.App.4th 684, 700 [13 Cal.Rptr.3d 198].)

■ In *In re Isayah C., supra*, 118 Cal.App.4th at page 700, the court held that the dependency court may consider placing a child with a noncustodial,

incarcerated parent under section 361.2 if that parent seeks custody of the child, the parent is able to make appropriate arrangements for the child's care during the parent's incarceration, and placement with the parent is not otherwise detrimental to the child. The *Isayah C.* court based its decision on the case law that held the juvenile dependency system has no jurisdiction to intervene "when an incarcerated parent delegates the care of his or her child to a suitable caretaker" and there is no other basis for jurisdiction under section 300. (*In re Isayah C.*, at p. 700.) At disposition, the length of a parent's incarceration may be a factor in determining detriment under sections 361, subdivision (c) and 361.2, subdivision (a), but a finding of detriment cannot be based solely on the fact a parent is incarcerated. (*In re S. D., supra*, 99 Cal.App.4th at p. 1077.)

Here, after it dismissed the allegations against Father, the court found him to be nonoffending and granted him custody of Noe, but did not make any statutorily required findings. As we have reversed the court's jurisdictional and dispositional order as to Mother, we must reverse the court's order granting custody to Father.

## DISPOSITION

The jurisdictional and dispositional order finding jurisdiction based upon Emma M.'s care choices, removing Noe F. from Emma M.'s custody, and granting custody to Noe S. is reversed.

Mallano, P. J., and Chaney, J., concurred.