Filed 6/21/21  In re M.L. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re M.L., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>E.D.,<br><br>        Defendant and Appellant. | A161395<br><br>(Alameda County Super. Ct. No. JD03269401) |

E.D. (Mother), the mother of four-year-old M.L., appeals from jurisdictional and disposition orders declaring her daughter a dependent of the juvenile court and placing her in out-of-home care with reunification services.  Mother contends the evidence was insufficient to support both orders.  We conclude M.L. is properly within the jurisdiction of the juvenile court under Welfare and Institutions Code section 300, subdivision (b),[1] and

---

[1] Further statutory citations are to the Welfare and Institutions Code.

1

that substantial evidence supports the court's decision to place her in foster care.

## BACKGROUND

In late August 2020, Mother called 911 to report a sexual assault that allegedly had occurred the previous night. Mother had difficulty providing a coherent statement to the responding officer. She said that she woke up feeling vaginal pain and noticed a sliding glass balcony door was open and some sort of drug had entered her body through a pin prick near her thumb. Mother said she was assaulted while she slept next to M.L. and that she bled "a lot" on the bed and floor. Afterward the assailant pulled her through the house, put her in the bathtub, and washed her. Mother said M.L. was also assaulted and requested that sexual assault exams be performed on both of them. She also believed "there were certain types of recording devices placed inside of the ceiling fixtures like the lights and smoke detector." The officer saw no wound on Mother's thumb, blood on the bed or floor, or signs of her having been dragged through the house.

The apartment was clean, but the refrigerator was unplugged and the only food in the house was one bag of Rice-a-Roni. Mother said that M.L. did not eat solid foods, only a doctor-prescribed formula. M.L. had a bottle but there was no other formula in the house. Mother said she needed to pick more up.

Mother was placed on a section 5150 psychiatric hold and transported to a hospital for evaluation and treatment. M.L., who is on the autism spectrum and has very limited verbal communication, was placed in protective custody. She had no visible marks or bruises and did not appear to be malnourished.

The next day the case worker met with Mother at the hospital. Mother denied that she had any prior mental health diagnoses or section 5150 holds. She repeated her report of a sexual assault, but this time she denied that there was blood on the bed or floor or recording devices in her ceiling fixtures. Rather, she said, she told the officers there was smoke coming from the smoke detectors. She said the officers lied about there being no food and insisted she had plenty of food in the house. However, she also confirmed that her refrigerator was not working and there was no formula in the home. She told the case worker that M.L. drinks Pediasure Peptide formula three times a day due to gastrointestinal difficulties and dietary restrictions.

The psychiatrist who met with Mother at the hospital observed delusional symptoms, specifically regarding her beliefs about being raped and watched by smoke detectors in her home. He was concerned about her ability to parent a young child with special needs, but Mother did not meet the criteria for an extended hold and was discharged that day. She was recommended for outpatient therapy but refused mental health services.

The Alameda County Social Services Department filed a juvenile dependency petition alleging under section 300, subdivision (b) that M.L. had suffered or was at substantial risk of suffering serious harm due to Mother's failure to provide for her, and under section 300, subdivision (g) that Mother had informed the Agency she was unwilling to care for M.L. and the father's identity and whereabouts were unknown. M.L. was detained in foster care.

The Agency's report for the jurisdiction and disposition hearing recommended that M.L. be declared a dependent of the juvenile court and placed in a foster home, with reunification services provided for Mother. The report detailed a long child welfare history that included three substantiated allegations of general neglect and, in one case, physical abuse, regarding

Mother's older children.[2]  Child welfare records from 2003 to 2013 reflected a pattern of Mother making false allegations about her children being physically or sexually abused, failing to feed them adequately, lacking food in the house, and having her power shut off.  Mother also misrepresented her mental health history.  Although she told the case worker her only prior diagnosis was post-traumatic stress disorder, CPS records disclosed she had previously been diagnosed with depressive disorder and histrionic and borderline personality traits.

The case worker met with Mother again on September 10, 2020.  Mother thought M.L. was detained because of " 'misunderstandings.' "  She denied that her mental health impaired her parenting, but said she was open to accepting mental health services.  She insisted there was food in the house when police arrived and was unsure why they said there was not.  She told the case worker the refrigerator was off that night because M.L. had turned it off.

M.L. stopped wearing underwear and pajamas at some point before the August incident because Mother thought she was allergic to them, although she was wearing both in her foster home with no adverse reaction.  Mother recently bought M.L. pajamas and underwear because she knew the Agency was concerned and she wanted M.L. returned to her care.

Mother continued to deny having any prior mental health diagnoses or concerns other than PTSD related to past sexual assaults.  She said she was unaware of her prior diagnosis with depressive disorder and histrionic and borderline personality traits or that she had received counseling, psychiatric services and medication as a minor.

---

[2] Mother's two sons live with their father in Modesto.  The identity of M.L.'s father was unknown.

Mother was a dependent minor when she was a teenager. Santa Clara County records from that period depict numerous episodes of Mother engaging in threatening, oppositional and assaultive behavior against peers and staff in group homes and shelters, alternating with periods where she behaved as a "model resident." (Italics omitted.)

B.C., the father of M.L.'s half-siblings, informed the caseworker he had always had custody of the two boys. In his view, Mother was " 'for sure unstable . . . not normal, she's not all there.' " The older boy had not seen Mother in 3 years, but the younger son had visits with her every other weekend. The boys told their father they remembered sleeping in shelters and parks with Mother.

The Agency opined that M.L. could not be safely returned to Mother's care. According to its report, "Although the mother is willing to accept mental health services, the mother's first appointment is scheduled for October 2020. The mother is also not being truthful and honest about her mental health history and her prior CPS history that involves concerns regarding her mental health. When confronted or when the mother is being asked to be open, the mother gets frustrated and easily disturbed. The mother has a history of calling authorities and CPS and making false allegations such as reporting that her children were being physically and sexually abused and upon interviewing, the children disclosed their mother told them to lie. The mother also has a history of not having food, or electricity upon law enforcement arriving and this has resulted in all three of her children being removed from her care. [M.L.] is also [nonverbal] and Autistic so the minor is unable to state her level of safety in the care of the mother." Further, Mother lacked stable housing and had no support network available to care for M.L. in an emergency.

5

The contested jurisdictional and disposition hearing was held remotely on October 7, 2020. Mother was not present due to phone issues, and the court denied her attorney's request for a continuance. Mother's counsel argued there was insufficient evidence to show a nexus between Mother's mental health issues and a risk of harm to M.L. M.L.'s attorney disagreed, arguing that Mother's mental health disorders, her inability to provide a stable home and meet M.L.'s dietary needs, and her lack of a support network presented a risk to M.L.'s health and safety. The Agency concurred, and reiterated that, while mental illness alone is not a sufficient reason for dependency jurisdiction or removal, the evidence established that Mother's mental health problems prevented her from safely caring for M.L.

The court found M.L. to be a dependent of the court and, by clear and convincing evidence, that returning her to Mother's care would cause a substantial danger to her health, safety or well-being and that there were no reasonable means to protect her other than removal. It explained: "The evidence in this matter, through the admitted reports, demonstrates what appears to be a long-standing and profound history of substantial mental illness suffered by the mother. And I think all Counsel have been abundantly clear and the Court should as well, that children are not removed or detained just by virtue of a parent's mental illness. But the fact is that mother's mental illness seems to rage out of control and create what could have—fairly be described as utter chaos in the family home, to the extent that they have a home and when they have a home, that would severely impact a child who didn't have the special needs of [M.L.], [M.L.] being autistic, and having communication challenges that go with autism, unable to voice or describe what she is experiencing.

"None of us can truly know the trauma that the child may have been subjected to over her life with the mother, specifically the trauma of the law enforcement contacts, police coming into the home, allegations of sexual abuse that . . . as yet are unsubstantiated, and the possibility of a child being exposed or forced to engage in a SART exam, a Sexual Assault Response Team exam by a medical provider, which by its very own experience would be traumatic, certainly for a child." Moreover, "the child is at risk, not only because of the trauma, the police reports, the possible SART exams, the allegations of being told that she's been sexually abused, over [*sic*] overhearing that she's a child that has been sexually assaulted or raped, but also even basic fundamental needs, like the child's diet that the Mother seems to have convinced herself or taken information about the child's health and dietary needs that don't seem supported by the evidence before the court, and the child was given limited food and nutrition opportunities, it would seem, in part because of what might be ascribed to the mother's mental illness."

"And so the Court does find that the Agency has met their burden of proof, and it is almost to a certainty that the cycle of mental illness will come around again and that the child would be continually at risk of further substantial harm if she is not detained and if she is returned to the mother."

## DISCUSSION

As at the October 7 hearing, Mother contends the evidence was insufficient to support the court's jurisdictional and disposition orders. We disagree.

## I. Jurisdictional order

A child may be subject to juvenile court jurisdiction under section 300, subdivision (b) if the court finds by a preponderance of the evidence that

7

"[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . or by the willful or negligent failure of the parent or guardian to provide the child with adequate clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (§ 300, subd. (b); *In re I.J.* (2013) 56 Cal.4th 766, 773.)

" 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.]' " (*In re I.J., supra,* 56 Cal.4th at p. 773.)

We are satisfied the record here contains substantial evidence that Mother's ongoing mental health issues placed M.L. at a substantial risk of harm. The apparently delusional episode that sparked these proceedings, in the context of Mother's history of making false reports of abuse to authorities and her longstanding mental health problems, presents compelling evidence that until those problems are addressed, M.L. would be at a substantial risk of further traumatic episodes in Mother's care. Moreover, the family's earlier child welfare reports as well as the lack of adequate food and refrigeration in the house at the time of the August incident evidence serious concerns about

8

Mother's ability to understand M.L.'s dietary needs and to provide her with adequate nutrition and supervision. On this record, therefore, we will not disturb the court's section 300, subdivision (b) finding that M.L. was at a substantial risk of serious harm in Mother's care. Jurisdiction was properly established.

## II. Disposition order

Pursuant to section 361, subdivision (c)(1), children " 'shall not be removed from the home in which they are residing at the time of the petition unless there is clear and convincing evidence of a substantial danger to the [children']s physical health, safety, protection, or physical or emotional well-being and there are no "reasonable means" by which the [children] can be protected without removal.' [Citation.] 'A removal order is proper if it is based on proof of parental inability to provide proper care for the minor and proof of a potential detriment to the minor if he or she remains with the parent. [Citation.] The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. [Citations.]' [Citation.]" (*In re Noe F.* (2013) 213 Cal.App.4th 358, 367, italics omitted.) We review the dispositional order for substantial evidence, keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence. (*Ibid.*)

Here, Mother's challenge to the dispositional order rests on her claim that the court's *jurisdictional* findings and order were unsupported by the evidence. It is unpersuasive for the same reason: the above-described evidence supporting the jurisdictional order also supports the court's finding that M.L. would be at a substantial risk of harm unless removed from Mother's care. (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 694 [removal

9

from parental custody requires evidence that is reasonable, credible and of solid value such that a reasonable trier of fact could find it necessary based on clear and convincing evidence].)

Mother's contrary arguments are unpersuasive. Her assertions that M.L. did not appear to be malnourished or to bear any marks or bruises, that there was no evidence Mother was unwilling to provide care for her, that she was open to accepting mental health and other services, and that voluntary supervision would alleviate any concerns about M.L.'s welfare go to the interpretation and weight of the evidence, which we may not reassess. (*In re L.M.* (2019) 39 Cal.App.5th 898, 914.) Having identified substantial evidence supporting the disposition order, "it is of no consequence that the court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874, italics omitted.) On this record, we decline to disturb the trial court's determination that removal was necessary.

## DISPOSITION

The jurisdictional and disposition orders are affirmed.

_____

                                                   Wiseman, J.*

WE CONCUR:


_____

Fujisaki, Acting P.J.


_____

Jackson, J.

_____

      * Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.