Filed 8/2/22  In re Daniel C. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re DANIEL C., a Person Coming Under the Juvenile Court Law. | B315644 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 18CCJP00018A) |
| Plaintiff and Respondent, | |
| v. | |
| MARIA V. et al., | |
| Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Steff Padilla, Commissioner.  Affirmed.

Gina Zaragoza, under appointment by the Court of Appeal, for Defendant and Appellant Maria V.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant Daniel C.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, Veronica Randazzo, Deputy County Counsel for Plaintiff and Respondent.

―――――――――――

Maria V. (mother) and Daniel C., Sr. (father) appeal from the juvenile court's order terminating parental rights to their son, Daniel C., and mother appeals from an order denying her modification petition under Welfare and Institutions Code[1] section 388. Both parents contend the orders terminating parental rights should be reversed because the Los Angeles County Department of Children and Family Services (DCFS) failed to comply with its duty of inquiry under state laws implementing the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) because it did not ask certain extended family members if Daniel had Indian ancestry. Mother additionally asserts that the juvenile court abused its discretion by denying her request for increased visitation. We conclude the juvenile court did not abuse its discretion by finding that DCFS conducted an adequate ICWA investigation or by denying mother's petition to change court order. We therefore will affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

### I. Father's prior dependency history.

Father has three older children with a former wife: Kaia, Aiden, and Jude. In 2000, the juvenile court sustained a dependency petition alleging that Kaia was discovered at the age

―――――――――

[1] All subsequent undesignated statutory references are to the Welfare and Institutions Code.

2

of three months to have suffered subdural hematomas with chronic bleeding from the brain, fractured ribs, and retinal hemorrhaging. Kaia was removed from her parents' care and placed in a long-term guardianship.

In 2010, an allegation was substantiated that father had sexually abused Aiden. In 2011, a civil protective order was entered protecting Aiden and Jude from father for five years.

In 2016, the juvenile court sustained allegations that Aiden and Jude were the victims of physical abuse by father and domestic violence between father and their mother. Reunification services for father were terminated in October 2017, and the children were placed with their mother.

## II. Present petition.

Mother and father brought three-month-old Daniel to the hospital in December 2017 because he had a swollen left leg. Doctors determined that Daniel had sustained multiple fractures, including to his ribs, clavicle, pelvis, and tibia, which were at different stages of healing. The injuries appeared to be non-accidental and the parents were not able to explain them.

In January 2018, DCFS filed a juvenile dependency petition alleging that Daniel was at substantial risk of serious physical harm because he had suffered multiple unexplained fractures and his paternal half-sibling had suffered similar injuries at the same age (counts a-1, b-2, e-1, j-1).[2] A first amended petition filed in February 2018 added an additional allegation that Daniel had been diagnosed as failing to thrive.

---

[2] The petition also alleged that the parents failed to obtain timely medical care for Daniel's injuries. The court dismissed this count.

3

On January 3, 2018, the juvenile court ordered Daniel detained from both parents, and in late January 2018, Daniel was placed with his godmother, Vanessa L., who is the prospective adoptive parent. In May 2018, the court sustained counts a-1, b-1, and e-1 of the petition, and dismissed count j-1.

### III. Disposition.

Mother reported that she had been raised by her mother and father and was an only child. Her father had died about 15 years earlier. She has three adult children: Maria, Armando, and Antonio. Mother expressed surprise that Daniel's injuries were being compared to Kaia's, for which she denied father was responsible. Mother did not suspect that father had caused Daniel's injuries.

Father said he had been removed from his parents as a child due to severe physical child abuse, and he had been raised, along with his six siblings, by his maternal uncle and aunt. His mother suffered from bipolar disorder and schizophrenia, and his parents spent time in prison for child abuse. Father believed his mother lived in Arizona and his father lived in Huntington Park, but he was not in contact with them. The uncle who raised him had died in 2015, and father was not in contact with his uncle's wife. He was close with his brother Michael, with whom he had been raised.

Father has a lengthy criminal history, including convictions for spousal abuse, grand theft, and burglary. He denied causing Daniel's injuries but could not explain how they had happened. He also denied injuring Kaia, saying she had not been under his care when she was injured.

In April 2018, four months after Daniel was placed in foster care, mother and father married.

4

At the September 6, 2018 disposition hearing, the juvenile court denied father reunification services, concluding that he had injured three children and had no insight into child protection. Over DCFS's objection, the court granted mother reunification services, telling mother: "[Y]ou have a choice today: Your baby or your husband. I'm sorry. That is the reality." Mother responded: "My baby, obviously." The court therefore granted mother monitored visits and ordered her to participate in domestic violence counseling, a domestic violence support group for victims, and individual counseling to address case issues, telling mother she had "a lot of work to do to show me [you're] not going to that let that man, that father, into this child's life until he does a whole lot of work." Father was also granted monitored visits, but mother and father were not to visit together.

## IV. Subsequent events; termination of parental rights.

Following the September 2018 disposition hearing, Vanessa told a children's social worker (CSW) that mother had said she had no intention of ending her relationship with father and intended to resume seeing him after the case was over.

In early January 2019, mother claimed father had moved out of her home and was living with his brother Michael. The following month, however, the CSW observed father's truck parked in front of mother's house and saw father leave mother's home in the early morning. The same month, the CSW noted that mother's Facebook profile included a picture of father, and mother had recently posted a picture of the family together on New Year's Day.

In November 2019, mother reported that she was no longer seeing father and they were divorced. However, photographs and

text messages between mother and father indicated they were still romantically involved.

In December 2019, DCFS reported that mother had completed her court-ordered services and was voluntarily participating in individual therapy, but she had not been forthcoming about her continued relationship with father. DCFS therefore recommended that mother's reunification services be terminated.

In January 2020, the CSW was told that mother and father recently had been seen together at a community event. The CSW spoke with a waitress at the restaurant where the event was held, who confirmed mother and father had been there together and had spent an hour kissing "like . . . teenagers." Father confirmed he had been at the restaurant on that date, but he denied mother was with him. The waitress subsequently reported that she had received a phone call from someone who claimed to be representing the C. family and threatened she would be harmed if she appeared at a hearing.

In May 2020, police were called to mother's residence because of an altercation between father and mother's adult son, Antonio. Antonio said father had yelled profanities at his sister, Maria, after she inadvertently opened a DCFS report that described why Daniel had been removed from the parents. When Antonio told father not to speak to his sister that way, father grabbed Antonio around the neck, injuring him, and mother kicked Antonio and Maria out of the house. Both Antonio and Maria told DCFS that father had never moved out of mother's house and had rented a room elsewhere only to deceive the court. Both siblings separately told DCFS they supported Daniel

remaining with his caregiver because they did not believe mother would protect Daniel from father.

On September 22, 2020, the trial court terminated mother's reunification services, finding that mother was not in compliance with the case plan due to her continued contact with father. The court found that mother had consistently chosen father over Daniel and would continue to do so in the future.

## V. Denial of mother's section 388 petition; termination of parental rights.

Mother filed a request to change court order pursuant to section 388 in March 2021. Mother asked that her reunification services be reinstated and Daniel be returned to her care or, in the alternative, that her visitation be increased. Mother asserted that circumstances had changed because she had completed her case plan and "made significant personal changes and improvements" which would allow her to properly parent and protect her child. She further asserted that the proposed change would be in Daniel's best interests because he was deeply bonded to mother and wanted to return to her care.

DCFS reported that mother had consistently participated in virtual visits with Daniel, but he acted out during visits by walking away from the phone or covering his face. Once, he threw the caregiver's phone on the floor and broke it. During a virtual visit observed by the CSW, Daniel said hello to mother and then ran away. When the caregiver tried to redirect him back to the phone, he screamed, threw himself on the floor and kicked, said, "No, no, no," and again ran away from the phone.

DCFS further reported that although mother had filed for divorce from father in August 2019, the matter was taken off

calendar when mother did not appear. Notices sent to mother in June and December 2020 said the divorce was incomplete.

At a September 21, 2021, hearing, the court found that mother had not demonstrated a substantial change of circumstances or that the relief she requested was in Daniel's best interests. It therefore denied mother's section 388 petition.

On October 5, 2021, the court terminated mother's and father's parental rights to Daniel. Both parents timely appealed.

## VI.  ICWA inquiry.

On December 17, 2017, the CSW signed under penalty of perjury an Indian Child Inquiry Attachment (ICWA-010) stating that an Indian child inquiry had been made and Daniel "has no known Indian ancestry."

On January 3, 2018, both parents signed ICWA-020 forms denying Indian ancestry. The forms stated: "To the parent, Indian custodian, or guardian of the above-named child: You must provide all the requested information about the child's Indian status by completing this form. If you get new information that would change your answers, you must let your attorney, all the attorneys on the case, and the social worker or probation officer, or the court investigator know immediately and an updated form must be filed with the court."

The same day, the court noted on the record, in the presence of several members of the extended family, that it had received parents' ICWA-020 forms indicating no Indian ancestry.[3]

---

[3]     It is not entirely clear from the record which members of the extended family were present in the courtroom. Minor's counsel stated that there were "quite a bit of relatives" in the courtroom, including the paternal aunt, paternal cousin, adult

8

It therefore found "no reason to know or believe that the child is an Indian child as that term is defined by the Indian Child Welfare Act." The January 3, 2018 minute order states: "The Court does not have a reason to know that this is an Indian Child, as defined under ICWA, and does not order notice to any tribe or the BIA. Parents are to keep the Department, their Attorney and the Court aware of any new information relating to possible ICWA status. JV-020, the Parental Notification of Indian Status, is signed and filed."

At the disposition hearing, and again at the termination hearing, the court found that Daniel was not an Indian child and ICWA did not apply.[4]

---

sibling, paternal grandmother, and godmother. Mother's counsel then made a "correction," stating that the people present were the maternal grandmother, maternal aunt, maternal half-sibling, and godmother. The same day, relative caretaker information sheets were filled out by the maternal grandmother, maternal half-sister Maria, paternal uncle Michael, godmother Vanessa, and neighbor Anita D.

[4] The jurisdiction/disposition report says that the parents denied Indian ancestry on "1/16/17." Since the case was not opened until December 2017, the date is clearly in error. It is likely the inquiry was made sometime between December 27, 2017, when the referral was received, and December 29, 2017, when the CSW represented in the ICWA-010 form that an Indian child inquiry had been made and Daniel had no known Indian ancestry.

At various times during the proceedings, DCFS spoke to the maternal grandmother, maternal half-sister Maria, paternal uncle Michael, and a paternal aunt, Diane.[5]

## DISCUSSION

Mother contends the juvenile court abused its discretion by denying her section 388 petition, and both parents contend that the court failed to ensure that DCFS made an adequate ICWA inquiry. We disagree.

## I. The juvenile court did not abuse its discretion by denying mother's section 388 petition.

Section 388 permits parents to petition the juvenile court for modification of any order based upon changed circumstances. (§ 388; *In re Marilyn H.* (1993) 5 Cal.4th 295, 308–309.) To be entitled to modification, the parent must demonstrate both changed circumstances and that the proposed change is in the child's best interests. (*In re Alayah J.* (2017) 9 Cal.App.5th 469; Cal. Rules of Court, rule 5.570(a), (e).) We review the denial of a section 388 petition for an abuse of discretion. (*In re Mia M.* (2022) 75 Cal.App.5th 792, 806; *In re D.P.* (2022) 76 Cal.App.5th 153, 163.)

Mother's section 388 petition requested that her reunification services be reinstated and Daniel be returned to her care or, in the alternative, that mother be permitted increased

---

[5] Paternal aunt Diane C. contacted DCFS in early 2020 to get information about the proceedings and to request that Daniel be placed with her. She said she had learned about the juvenile court proceedings through a sibling, but would not provide the sibling's name.

visitation.  On appeal, mother does not contend the court should have restored her reunification services, returned Daniel to her care, or increased her visitation, but instead urges the trial court abused its discretion by failing to ensure that mother received in-person, rather than virtual, visitation.

Below, mother had in-person visits from the case's inception until the beginning of the Covid-19 pandemic, at which time she began visiting virtually through FaceTime.  Mother reportedly was comfortable with virtual visits and did not ask that in-person visits be resumed.  Further, mother's counsel did not suggest, at either the September 20, 2020 hearing at which mother's reunification services were terminated, or at the September 2021 hearing on mother's section 388 petition, that services had been inadequate because mother had not been permitted in-person visits.  Manifestly, the juvenile court did not abuse its discretion by rejecting an argument mother did not make.  (See, e.g., *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 826 [appellate courts " 'are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider' "].)

Nor did the juvenile court abuse its discretion by concluding that mother had not demonstrated changed circumstances or that the proposed changes were in Daniel's best interests.  Mother asserted in her petition that circumstances had changed because she had completed her case plan and regularly visited with Daniel, and that the proposed change was in his best interests because he was deeply bonded to her.  In fact, mother's completion of court-ordered services was not a change of circumstance:  DCFS reported in December 2019—nearly nine

11

months before the juvenile court terminated mother's reunification services—that mother had completed her court-ordered services. DCFS nonetheless recommended that mother's reunification services be terminated because mother had demonstrated a lack of protective capacity by continuing to be in a relationship with father. The court agreed, noting when it terminated mother's services that "[m]other will always choose the father over the baby." Mother did not contend in her section 388 petition that she had ended her relationship with father, and thus she failed to make a prima facie case of changed circumstances.

There was, moreover, substantial evidence before the court that Daniel was not bonded to mother. DCFS reported that Daniel consistently acted out during virtual visits with mother, running away from the phone, covering his face, and throwing the caregiver's phone on the floor. There is no evidence that Daniel asked for mother between visits or said that he missed her. On this record, therefore, the juvenile court did not abuse its discretion by denying mother's section 388 petition.

## II. Substantial evidence supported the juvenile court's finding that ICWA did not apply.

### A. ICWA.

ICWA was enacted " 'to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture . . . .' [Citation.]"

(*In re Isaiah W.* (2016) 1 Cal.5th 1, 8 (*Isaiah W.*); see 25 U.S.C. § 1902.)

"[T]he burden of coming forward with information to determine whether an Indian child may be involved . . . in a dependency proceeding does not rest entirely—or even primarily—on the child and his or her family." (*In re Michael V.* (2016) 3 Cal.App.5th 225, 233.) Rather, "[j]uvenile courts and child protective agencies have 'an affirmative and continuing duty to inquire' whether a dependent child is or may be an Indian child." (*Ibid.*; see also *Isaiah W.*, *supra*, 1 Cal.5th at pp. 9–11; § 224.2, subd. (a).) An "Indian child" is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); see also § 224.1, subd. (a) [adopting federal definition of "Indian child"].)

This affirmative duty to inquire has several elements. If a child is removed from his or her parents and placed in the custody of a county welfare department, the department has a duty to inquire whether a child is an Indian child. Such inquiry "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child . . . ." (§ 224.2, subd. (b).) The court also must make an ICWA inquiry when the parents first appear in court: The court "shall ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child" (§ 224.2, subd. (c)), and must require each party to complete California Judicial Council Form ICWA-020, Parental

13

Notification of Indian Status (Cal. Rules of Court, rule 5.481(a)(2)(C)).

If the court or social worker has "reason to believe that an Indian child is involved in a proceeding," the court or social worker must "make further inquiry regarding the possible Indian status of the child" by, among other things, interviewing the parents and extended family members, and contacting any tribe that may reasonably be expected to have information about the child's membership, citizenship status, or eligibility. (§ 224.2, subd. (e)(2).) There is "reason to believe" a child involved in a proceeding is an Indian child whenever the court or social worker "has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe." (§ 224.2, subd. (e)(1).)

If the agency's inquiry creates a "reason to know" that an Indian child is involved, notice of the proceedings must be provided to the parent, legal guardian, or Indian custodian and the child's tribe. (§ 224.2, subd. (f).) There is "reason to know" a child is an Indian child if any one of six statutory criteria is met—e.g., if the court is advised that the child "is an Indian child," the child's or parent's residence is on a reservation, the child is or has been a ward of a tribal court, or either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe. (§ 224.2, subd. (d).) Thereafter, the court shall confirm that the agency used due diligence to identify and work with all of the tribes of which there is reason to know the child may be a member, or eligible for membership, to verify whether the child is in fact a member or whether a biological parent is a member and the child is eligible for membership. (§ 224.2, subd. (g).) A determination by an Indian

14

tribe that a child is or is not a member of, or eligible for membership in, that tribe "shall be conclusive." (§ 224.2, subd. (h).)

If the juvenile court finds that "proper and adequate further inquiry and due diligence as required in this section have been conducted and there is no reason to know whether the child is an Indian child," the court may make a finding that ICWA does not apply to the proceedings, "subject to reversal based on sufficiency of the evidence." (§ 224.2, subd. (i)(2).)

## B.    Standard of review.

As noted above, section 224.2, subdivision (i)(2) sets out two statutory predicates to a juvenile court's finding that ICWA does not apply. First, the court must determine whether there is "reason to know" whether the child is an Indian child. Second, the court must decide whether a "proper and adequate further inquiry and due diligence as required in this section have been conducted." If the court finds an adequate inquiry has been conducted and there is no reason to know a child is an Indian child, "the court may make a finding that the federal Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) does not apply to the proceedings." (§ 224.2, subd. (i)(2).)

The first element—whether there is reason to know whether the child is an Indian child—requires the juvenile court to determine, based on the evidence before it, whether any one of six statutory criteria is met—e.g., (1) the court has been advised that the child "is an Indian child," (2) the child's or parent's residence is on a reservation, (3) any participant in the proceeding informs the court that it has discovered information indicating the child is an Indian child, (4) the child gives the court reason to know that he or she is an Indian child, (5) the

15

child is or has been a ward of a tribal court, or (6) either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe.  (§ 224.2, subd. (d).)  If none of these six factors is met, the court must make a finding that there is no reason to know the child is an Indian child.  Because this determination is fundamentally factual, we review it for substantial evidence.  (*In re Ezequiel G.* (2022) __ Cal.App.5th __, 2022 WL 3009914, *7 (*Ezequiel G.*); *In re Josiah T.* (2021) 71 Cal.App.5th 388, 401; *In re D.F.* (2020) 55 Cal.App.5th 558, 565.)  In other words, we "should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts,' " but should uphold the lower court's determinations " 'if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*In re Caden C.* (2021) 11 Cal.5th 614, 640; *In re J.N.* (2021) 62 Cal.App.5th 767, 774; *In re Noe F.* (2013) 213 Cal.App.4th 358, 366.)

The second element—whether a "proper and adequate further inquiry and due diligence as required in this section have been conducted"—is somewhat different.  Deciding whether an inquiry was "adequate" and an agency acted with appropriate diligence requires more of a court than simply applying a statutory checklist to undisputed facts.  Instead, it requires the court to "engage in a delicate balancing" (see *In re Caden C.*, *supra*, at p. 640) to assess whether an ICWA inquiry was appropriate and sufficient in light of the facts of a particular case.  In short, the statute directs the juvenile court to perform a quintessentially discretionary function, and thus we review it for

abuse of discretion. (*In re Ezequiel G.*, *supra*, 2022 WL 3009914, at *7.)

If we conclude that the trial court erred in finding that an adequate ICWA inquiry was conducted, we will return the case to the juvenile court only if the error was prejudicial—that is, if "the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA, such that the absence of further inquiry was prejudicial to the juvenile court's ICWA finding." (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 779.) As our colleagues in Division Two have recently explained, this test is "outcome focused," asking whether "it is reasonably probable that an agency's error in not conducting a proper initial inquiry affected the correctness (that is, the *outcome*) of the juvenile court's ICWA finding," and remanding only in those cases "in which the record gives the reviewing court a reason to believe that the remand may undermine the juvenile court's ICWA finding." (*Id.* at pp. 781–782, italics added.)

## C. The juvenile court did not prejudicially err in finding that ICWA did not apply.

Although both parents denied Indian ancestry below, they contend on appeal DCFS's failure to make an ICWA inquiry of the children's extended family members was reversible error. We disagree.

First, substantial evidence unquestionably supported the juvenile court's finding that there is no reason to know that Daniel is an Indian child. DCFS made an initial ICWA inquiry before filing the petition and attached to the petition an ICWA-010 form attesting that an Indian child inquiry had been made and Daniel had no known Indian ancestry. Subsequently, both parents signed ICWA-020 forms in which they stated, under

17

penalty of perjury, that they did not have Indian ancestry. At no point—including now, on appeal—has either parent suggested these responses were inaccurate, and no member of Daniel's extended family has ever told DCFS that Daniel has Indian ancestry. Accordingly, all the evidence before the juvenile court required the conclusion that there was no reason to know Daniel is an Indian child.

Second, the juvenile court did not abuse its discretion in concluding that DCFS conducted an adequate inquiry. In reviewing a juvenile court's ICWA findings for abuse of discretion, the key question for a reviewing court is whether the ICWA investigation has reliably answered the question at the heart of the ICWA inquiry: Whether a child involved in a proceeding "is or may be an Indian child" (§ 224.2, subd. (a))—that is, whether he or she either (a) "is a member of an Indian tribe" or (b) "is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903, subd. (4); see also § 224.1, subds. (a) & (b).) In other words, the focus of the court's analysis is not on the number of individuals interviewed, but on whether the agency's ICWA inquiry has yielded reliable information about a child's possible tribal affiliation. (*In re Ezequiel G.*, *supra*, 2022 WL 3009914, at *9.)

As we recently have explained, "ICWA does not apply simply based on a child or parent's Indian ancestry." (*In re Ezequiel G.*, *supra*, 2022 WL 3009914, at *9, citing U.S. Dept. of Interior, Bureau of Indian Affairs, Guidelines for Implementing the Indian Child Welfare Act (Dec. 2016) (BIA Guidelines), p. 10 <https://www.bia.gov/sites/default/files/dup/assets/bia/ois/pdf/idc2 -056831.pdf> [as of July 29, 2022], archived at

18

<https://perma.cc/SH5E-HQBN>.) Instead, the definition of "Indian child" is "based on the child's *political ties* to a federally recognized Indian Tribe, either by virtue of the child's own citizenship in the Tribe, or through a biological parent's citizenship and the child's eligibility for citizenship." (Indian Child Welfare Act Proceedings, 81 Fed.Reg. 38795 (June 14, 2016) (BIA ICWA Proceedings), italics added.) In other words, an Indian child is one with a *tribal affiliation*, not merely Indian ancestry.

"Tribal citizenship (aka Tribal membership) is voluntary and typically requires *an affirmative act* by the enrollee or her parent." (BIA ICWA Proceedings, *supra*, 81 Fed.Reg. 38783, italics added.) Specifically, "Tribal laws generally include provisions requiring the parent or legal guardian of a minor *to apply for* Tribal citizenship on behalf of the child. [Citation.] Tribes also often require an affirmative act by the individual seeking to become a Tribal citizen, such as the filing of an application. [Citation.] As ICWA is limited to children who are either enrolled in a Tribe or are eligible for enrollment and have a parent who is an enrolled member, *that status inherently demonstrates an ongoing Tribal affiliation*." (*Ibid*., italics added; see also BIA Guidelines, *supra*, at p. 10 ["Most Tribes require that individuals apply for citizenship and demonstrate how they meet that Tribe's membership criteria."].) Because membership in an Indian tribe therefore requires that an individual or his or her parent *apply* for tribal membership, a child's parents will, in most cases, be a reliable source of information for determining whether a child is an Indian child.

In the present case, nothing in the record gives us reason to doubt the accuracy of mother's denial of a tribal affiliation.

Mother had been raised by her parents and continued to live with her mother (the maternal grandmother) at the time of the detention hearing. Thus, the possibility that mother might unknowingly be a member of a tribe appears trivially small. Additionally, mother's mother (the maternal grandmother) and mother's grown daughter were present at the courtroom when the juvenile court stated that both parents had denied having any Indian heritage, and neither contradicted mother's report or offered different information. Accordingly, the juvenile court did not abuse its discretion by concluding that DCFS conducted an adequate ICWA inquiry as to mother.

Father presents a closer question: He had been removed from the custody of his parents when he was a child and, at the time of these proceedings, he was not in touch with his own mother or father. We therefore cannot be as certain as we are in mother's case that father was fully knowledgeable about his own ancestry. We nonetheless conclude that the juvenile court did not abuse its discretion by finding that DCFS conducted an adequate ICWA inquiry as to father. First, although father was removed from his parents as a child, he, along with his six brothers and sisters, were raised by his uncle, not in foster care. Because father therefore remained connected to his extended family into adulthood, we believe it highly unlikely that father might unknowingly be a tribal member. Moreover, even were we to conclude that further inquiry into father's ancestry was warranted, the juvenile court record does not suggest there were any members of father's extended family who were both reasonably available to DCFS and likely to have had relevant information about the family's ancestry. Father was not in contact with his parents, was not certain where they lived, and

did not provide DCFS with their names or contact information. Father's uncle, who had raised him, had died, and father did not identify any of his parents' siblings (if they had any) who were still living. Father also did not identify any living grandparents. The only member of father's family for whom he had contact information, his brother Mark, had been raised by the same uncle who raised father, and thus he was unlikely to have any different information about the family's ancestry than father did.

For all of these reasons, we see no reasonable avenue by which DCFS could have obtained any additional information about father's theoretical tribal membership. We note, moreover, that neither father nor mother challenged DCFS's ICWA inquiry or the juvenile court's ICWA findings below, when they could have been readily corrected. We therefore conclude that the juvenile court did not abuse its discretion by finding that DCFS had conducted an adequate ICWA inquiry as to father. (See, e.g., *In re A.M.* (2020) 47 Cal.App.5th 303, 323 [agency's failure to interview maternal relatives was reasonable where mother could not provide information about maternal relatives and no maternal relative appeared at any hearing or participated in the matter]; *In re K.M.* (2009) 172 Cal.App.4th 115, 119 [where child protective agency "attempted on several occasions to elicit further information from the child's family, but was unsuccessful due to the family's hostility" toward the agency, the agency "did all that can or should be reasonably expected of it to meet its obligation to the child, to the family, to the tribes and to the court."].)

For all the same reasons, even if the juvenile court erred by finding DCFS's inquiry adequate, that error was not prejudicial because it is not "reasonably probable that an agency's error in not conducting a proper initial inquiry affected the correctness

21

(that is, the *outcome*) of the juvenile court's ICWA finding." (*In re Dezi C., supra,* 79 Cal.App.5th at p.781, italics added.)  As we have said, nothing in the juvenile court record gives us a reason to doubt the accuracy of the parents' denial that they or their children were members of or eligible for membership in an Indian tribe, and neither parent has made a proffer on appeal that he or she has Indian heritage.  Further, even were we to send the matter back, there appear to be no persons reasonably available to DCFS who are likely to provide relevant information.  No remand therefore is warranted.

## DISPOSITION

The orders are affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



EDMON, P. J.



I concur:



EGERTON, J.

LAVIN, J., Concurring and Dissenting:

I agree that the juvenile court did not abuse its discretion by denying mother's petition under Welfare and Institutions Code section 388. In my view, however, the juvenile court erred by finding that the Department of Children and Family Services' inquiry under the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) and related state laws implementing ICWA (Welf. & Inst. Code, § 224 et seq.) was adequate, and that error was prejudicial. (See, e.g., *In re Antonio R.* (2022) 76 Cal.App.5th 421, 431 ["By requiring the Department to inquire of a child's extended family members as to the child's possible Indian ancestry, the Legislature determined that inquiry of the parents alone is not sufficient."]; *In re A.R.* (2022) 77 Cal.App.5th 197, 207 [a rule requiring reversal in all cases where ICWA requirements have been ignored is consistent with the recognition that parents are effectively acting as surrogates for the interests of Native American tribes].)

LAVIN, J.