Filed 5/18/22; Certified for Publication 6/16/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Q.M. et al., Persons Coming Under the Juvenile Court Law. | B313171 |
| _____ | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. DK12546C-D) |
| Plaintiff and Respondent, | |
| v. | |
| PAMELA M., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Michael C. Kelley, Judge. Affirmed.

Suzanne M. Nicholson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Kimberly Roura, Deputy County Counsel for Plaintiff and Respondent.

_____

Pamela M. (mother) appeals from orders of the juvenile court terminating parental rights to two of her four children. Mother contends the juvenile court erred by finding that the Los Angeles County Department of Children and Family Services (DCFS) adequately investigated the children's possible Indian ancestry, as required by the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) and related state statutes. We find no error, and thus we will affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother and James M. (father) have four children: K.M. (born in Aug. 2006), James M. (born in Feb. 2008), Q.M. (born in April 2010), and P.M. (born in Dec. 2013). This appeal concerns only Q.M. and P.M.

### A.    Investigation and detention.

On October 22, 2015, DCFS filed a dependency petition alleging that the children came under the jurisdiction of the juvenile court pursuant to Welfare and Institutions Code[1] section 300, subdivisions (b) and (j). The petition alleged that K.M. had a psychiatric condition for which the parents failed to obtain necessary treatment (counts b-1, j-1); father had mental and emotional problems, including paranoid delusions, which prevented him from safely caring for the children (count b-2); and mother and father had failed to provide appropriate care and supervision of the children (counts b-3, j-2). The petition subsequently was amended to add additional counts alleging that K.M. had marks on his body consistent with having been hit with

---

[1]    All subsequent statutory references are to the Welfare and Institutions Code.

a switch (counts b-4, j-3), and mother and father had a history of arguments and physical altercations in the children's presence (count b-5).

The October 2015 detention report stated that the family had come to the attention of DCFS because nine-year-old K.M. had become catatonic and lost control of his movements. Because K.M.'s medical tests were normal, he had been transferred to the psychiatric unit at the UCLA Medical Center. The parents discharged K.M. after two nights against medical advice, stating that " 'the devil' " was in him and they would conduct an exorcism. UCLA staff reported that father had symptoms of paranoia and schizophrenia, as evidenced by his statements that he was in communication with President Barak Obama, First Lady Michelle Obama, and Attorney General Eric Holder, headed a large non-profit corporation, and was the head of the United States mafia. Mother said she would not encourage father to seek mental health services because " 'that is the way he is.' " Mother and father both told DCFS that ICWA did not apply.

On October 22, 2015, both parents completed and signed ICWA-020 forms. Mother stated that she had "no Indian ancestry as far as I know"; father stated he "may have Indian ancestry" through a Cherokee tribe.

At the October 22, 2015 detention hearing, the court ordered all four children detained from the parents and placed in foster care. When father heard that his children would be detained, he responded that he would leave the courtroom to take care of paperwork because "I deal with the President of the United States . . . about the White House prophesy." After a break, the court noted that father "is in extreme distress and he is not responding to my questions." The court then asked father

3

whether he had Indian ancestry; father did not respond, but his lawyer said father "indicated that he may have some Cherokee. I believe he has got family in Louisiana. They would probably best be able to tell us." The court asked father to provide his lawyer and the social worker with any information relevant to father's possible Indian ancestry, and it then found there was "reason to believe that this may be an ICWA case and [the court] is going to order the Department to do further investigation based upon [father's] responses to his [ICWA] questionnaire and the indication that family members in Louisiana may have more information about their Indian status."

## B.    Jurisdiction, disposition, and initial appeal.

A contested jurisdiction hearing took place in September 2016. The juvenile court dismissed two counts of the petition and sustained the remaining counts as amended. Subsequently, in January 2017, the juvenile court entered a disposition order requiring both parents to submit to Evidence Code section 730 evaluations, participate in individual counseling, and complete parenting classes and domestic violence programs.

Mother and father appealed from the jurisdiction and disposition orders, raising only ICWA issues. While the appeal was pending, the parties stipulated to a conditional affirmance and limited remand with directions to the juvenile court to order DCFS to further investigate father's claims of Cherokee Indian heritage and, if appropriate, to provide proper ICWA notice. This court accepted the parties' stipulation and ordered a conditional affirmance and remand on June 23, 2017.

4

### C. Additional ICWA inquiry; termination of parents' reunification services.

On November 28, 2016, a dependency investigator contacted mother regarding ICWA. Mother said her family had no Indian ancestry. Mother then asked father about his family; father "replied that the family did not have any Indian American heritage and that he has said no before when he was asked that question."

On July 3, 2017, the juvenile court noted its receipt of the remittitur from the Court of Appeal and ordered DCFS to investigate father's claim of Cherokee heritage by interviewing the parents and any known relatives and providing ICWA notice to the appropriate tribes, the Bureau of Indian Affairs, and the Department of the Interior.

On August 31, 2017, the children's social worker (CSW) attempted to meet with the parents to have them sign an ICWA-020 form. However, the parents texted that they wanted to reschedule so they could first speak to their lawyers. They later sent the CSW the following text: " 'Do Cherokee have anything to do with our children coming home. If so we don't want anything to do with that.' " On September 5, 2017, mother told the CSW that " 'the Indian ancestry came back negative.' " When the CSW said she had to provide notice to the tribes if there was any possibility of Indian ancestry, mother said she and father would discuss it with their attorneys. The parents never again made themselves available to DCFS to discuss the family's possible Indian ancestry.

On November 3, 2017, father's counsel requested an expedited investigation into the suitability of placing the children

with paternal aunt Reba M. in Louisiana.  An address and telephone number for Reba were provided.

Sometime prior to March 2018, the parents moved to Louisiana, and later to Mississippi.  Their last visit with the children was in October 2017, and they thereafter telephoned the children only intermittently.

Neither parent was present at the July 5, 2018 status review hearing.[2]  Through their counsel, both parents objected to termination of family reunification services.  The juvenile court found that the parents had made minimal progress towards alleviating the causes of DCFS's intervention, terminated the parents' reunification services, and set a section 366.26 hearing for November 2018.  With regard to ICWA, the court asked counsel whether either parent had contacted them regarding ICWA, and both counsel confirmed they had not.  The court noted that the parents "are not cooperating with the Department with reference to the Department's efforts to get the ICWA-020 form and its information to send appropriate notice.  So at this time, I am ordering the Department to notice the appropriate tribes as well as the Bureau of Indian Affairs and Secretary of Interior, and that notice must be done prior to any . . . other hearings."

On August 16, 2018, DCFS filed a "Last Minute Information for the Court" repeating the details of the CSW's conversations with the parents regarding ICWA.

---

[2]     The July 5, 2018 hearing was nominally a 12-month review hearing, but it took place more than two years after the children were detained and nearly 18 months after the disposition hearing.

6

In November 2018, a CSW tried unsuccessfully to reach mother and father by calling numerous past or potential telephone numbers.  Letters and blank ICWA-030 forms were mailed to five possible addresses for the parents but were not returned.  On November 26 and December 21, 2018, and January 14, 2019, a CSW called a new telephone number for the parents and left messages, but she did not receive a return phone call.

On November 2, 2018, DCFS reported that the investigation into the possibility of placing the children with paternal aunt Reba had closed.  A Louisiana social worker had been unable to reach Reba by telephone, and after numerous attempts she had gone to Reba's home in person.  Reba was not home, but the social worker spoke to two men, one of whom said he lived in the home.  The home was described as "cluttered and unkempt" and was deemed unsuitable for the children.

On December 21, 2018, DCFS reported that it had attempted to reach both parents at a variety of different phone numbers and had left messages where possible.  It also had mailed ICWA forms to the parents at a variety of different addresses where DCFS believed they might be living.  DCFS had not been able to make any contact with the parents to determine if ICWA applied, and it therefore requested that the court make an ICWA finding in order to allow adoption to proceed.

On January 9, 2019, the court ordered DCFS to continue to try to contact the parents regarding ICWA and asked the parents' attorneys to encourage the parents to cooperate with DCFS's efforts to determine whether ICWA applied.  Both counsel agreed to do so.

The CSW again tried to contact father regarding his possible Indian ancestry on January 14, 2019, but father did not

7

return the call. The same day, the CSW mailed a blank ICWA form to father's last known address in Mississippi.

In April 2019, the CSW attempted to reach paternal aunt Reba regarding the paternal family's possible Indian ancestry, but the phone number provided was not in service.

On April 19, 2019, DCFS mailed ICWA notices, which included the limited information available, to registered Cherokee tribes, the Secretary of the Interior, and the Bureau of Indian Affairs (BIA). Each tribe responded that the children were not eligible for tribal membership.

## D. ICWA finding and termination of parental rights.

In June 2019, DCFS reported that the girls' caregiver was interested in adopting them, and K.M.'s and James's caregiver was interested in legal guardianship. All four children were doing well in their placements and no longer wished to return to the home of their parents.

In April 2021, DCFS reported that it had received responses from all noticed tribes stating the children were not Indian children. DCFS had not received a response from BIA, but more than 60 days had elapsed since notice was provided. DCFS therefore requested that the court find that the children were not Indian children and that ICWA did not apply. DCFS further requested that parental rights be terminated as to Q.M. and P.M.[3]

---

[3] Termination of parental rights was not requested for the boys. K.M. had been placed in out-of-home care after he was placed on a psychiatric hold in October 2020, and James was in

At the April 20, 2021 section 366.26 hearing, counsel for mother stated that she "do[es] not have direction" from mother, who was not present at the hearing, but she objected to termination of parental rights on mother's behalf. Counsel for father stated a similar objection. Neither attorney objected to DCFS's request that the court find that ICWA did not apply.

After hearing argument, the juvenile court found that DCFS "completed an appropriate investigation into potential Indian ancestry identified by the father [and] mailed notice to the relevant tribes." Based on the record before it, the court found there was no reason to know that the children were Indian children and that ICWA did not apply. The court then terminated parental rights as to Q.M. and P.M.

Mother timely appealed from the order terminating parental rights.

## DISCUSSION

Mother contends DCFS failed to conduct an adequate investigation into her and father's possible Indian ancestry. She urges that although she denied Indian ancestry, DCFS was required to contact her extended family members about possible Indian ancestry, and its failure to do so was reversible error. She further urges that because father made an initial report of Cherokee ancestry, DCFS had a duty to follow up with his extended family members in Louisiana.

DCFS contends that it conducted an adequate ICWA inquiry and there was no reason to believe Q.M. and P.M. were

_____

the process of being placed with his sisters, whose caregiver was open to adopting him.

Indian children.  In the alternative, DCFS urges that mother forfeited any error in this second appeal challenging ICWA inquiry by failing to raise the error below.

I.    **Relevant law.**

    A.    **ICWA.**

ICWA was enacted " 'to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture . . . .' [Citation.]" (*In re Isaiah W.* (2016) 1 Cal.5th 1, 8 (*Isaiah W.*); see 25 U.S.C. § 1902.)

"[T]he burden of coming forward with information to determine whether an Indian child may be involved . . . in a dependency proceeding does not rest entirely—or even primarily—on the child and his or her family." (*In re Michael V.* (2016) 3 Cal.App.5th 225, 233.)  Rather, "[j]uvenile courts and child protective agencies have 'an affirmative and continuing duty to inquire' whether a dependent child is or may be an Indian child." (*Ibid.*; see also *Isaiah W.*, *supra*, 1 Cal.5th at pp. 9–11; § 224.2, subd. (a).)  An "Indian child" is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); see also § 224.1, subd. (a) [adopting federal definition of "Indian child"].)

This affirmative duty to inquire has several elements.  The statute provides that if a child is removed from his or her parents

and placed in the custody of a county welfare department, the department has a duty to inquire whether a child is an Indian child.  Such inquiry "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child . . . ."  (§ 224.2, subd. (b).)  The court also must make an ICWA inquiry when the parents first appear in court: The court "shall ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child" (§ 224.2, subd. (c)), and must require each party to complete California Judicial Council Form ICWA-020, Parental Notification of Indian Status (Cal. Rules of Court, rule 5.481(a)(2)(C)).

If the court or social worker has "reason to believe that an Indian child is involved in a proceeding," the court or social worker must "make further inquiry regarding the possible Indian status of the child" by, among other things, interviewing the parents and extended family members, and contacting any tribe that may reasonably be expected to have information about the child's membership, citizenship status, or eligibility.  (§ 224.2, subd. (e)(2).)  There is "reason to believe" a child involved in a proceeding is an Indian child whenever the court or social worker "has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe."  (§ 224.2, subd. (e)(1).)

If the agency's inquiry creates a "reason to know" that an Indian child is involved, notice of the proceedings must be provided to the parent, legal guardian, or Indian custodian and the child's tribe.  (§ 224.2, subd. (f).)  There is "reason to know" a

11

child is an Indian child if any one of six statutory criteria is met—e.g., if the court is advised that the child "is an Indian child," the child's or parent's residence is on a reservation, the child is or has been a ward of a tribal court, or either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe. (§ 224.2, subd. (d).) Thereafter, the court shall confirm that the agency used due diligence to identify and work with all of the tribes of which there is reason to know the child may be a member, or eligible for membership, to verify whether the child is in fact a member or whether a biological parent is a member and the child is eligible for membership. (§ 224.2, subd. (g).) A determination by an Indian tribe that a child is or is not a member of, or eligible for membership in, that tribe "shall be conclusive." (§ 224.2, subd. (h).)

If the juvenile court finds that "proper and adequate further inquiry and due diligence as required in this section have been conducted and there is no reason to know whether the child is an Indian child," the court may make a finding that ICWA does not apply to the proceedings, "subject to reversal based on sufficiency of the evidence." (§ 224.2, subd. (i)(2).)

### B.     Standard of review.

Where, as here, the juvenile court finds that ICWA does not apply, " ' "[t]he finding implies that . . . social workers and the court did not know or have a reason to know the children were Indian children and that social workers had fulfilled their duty of inquiry." (*In re Austin J.* [(2020) 47 Cal.App.5th 870, 885]; see *In re D.S.* [(2020) 46 Cal.App.5th 1041, 1050] ["[t]he juvenile court may . . . make a finding that ICWA does not apply because the Agency's further inquiry and due diligence was 'proper and

12

adequate' but no 'reason to know' whether the child is an Indian child was discovered"].)' (*In re J.S.* (2021) 62 Cal.App.5th 678, 688.) ' "[W]e review the juvenile court's ICWA findings under the substantial evidence test, which requires us to determine if reasonable, credible evidence of solid value supports the court's order. [Citations.] We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance." ' (*In re D.F.* (2020) 55 Cal.App.5th 558, 565.)" (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 401.) " 'Thus, we do not consider whether there is evidence from which the dependency court could have drawn a different conclusion but whether there is substantial evidence to support the conclusion that the court did draw.' (*In re Noe F.* (2013) 213 Cal.App.4th 358, 366.)" (*In re J.N.* (2021) 62 Cal.App.5th 767, 774.)

## II. Substantial evidence supported the juvenile court's finding that ICWA did not apply.

### A. Substantial evidence supported the juvenile court's ICWA finding as to mother.

Mother urges the juvenile court erred in finding ICWA did not apply because DCFS did not contact mother's extended family members to inquire about possible Indian ancestry. We disagree.

It is undisputed that mother completed and signed an ICWA-020 form in which she said she "ha[d] no Indian ancestry as far as I know." It also is undisputed that mother told DCFS at least three different times—in October 2015, on November 28, 2016, and on September 5, 2017—that she did not have Indian ancestry. Notwithstanding these denials of Indian ancestry, mother contends that DCFS had a duty to investigate the

13

children's potential Indian ancestry by interviewing all available members of mother's extended family, and that the juvenile court erred by finding ICWA did not apply without requiring DCFS to undertake such an inquiry.

There appears to be a split among the Courts of Appeal as to a child welfare agency's duty to investigate a child's possible Indian ancestry where a parent denies such ancestry. Several Courts of Appeal have adopted the approach mother advocates, concluding that even where a parent denies any Indian ancestry, section 224.2, subdivision (b) requires DCFS, as part of its initial inquiry, to inquire of a child's extended family members regarding his or her possible Indian ancestry. (See, e.g., *In re Antonio R.* (2022) 76 Cal.App.5th 421, 426 [although mother reported she had no Indian ancestry, juvenile court erred by concluding DCFS had conducted adequate ICWA inquiry because it failed to inquire of the maternal grandmother, maternal aunts, and a maternal uncle about the child's possible Indian ancestry]; *In re A.C.* (2022) 75 Cal.App.5th 1009, 1015–1017 [although parents denied Indian ancestry, DCFS erred by failing to ask members of parents' extended family about the child's possible Indian ancestry]; *In re H.V.* (2022) 75 Cal.App.5th 433, 438 [juvenile court erred by terminating parental rights; although mother denied Indian ancestry, DCFS had a duty to inquire of the maternal great-grandmother and maternal great-grandfather].) Other courts have reached a contrary conclusion, holding that a parent's unequivocal denial of Indian ancestry is substantial evidence to support a juvenile court's finding that ICWA does not apply. (See, e.g., *In re Charles W.* (2021) 66 Cal.App.5th 483, 486–488, 490–491 [juvenile court and agency made adequate ICWA inquiry where mother's counsel, in

14

mother's presence, denied that mother had Indian ancestry]; *In re Austin J., supra*, 47 Cal.App.5th 870, 887–888 [no duty to make further inquiry regarding children's possible Indian ancestry through father where father's in-court statement and his parental notification of Indian status declaration indicated that he and his children had no Indian ancestry]; *In re A.M.* (2020) 47 Cal.App.5th 303, 323 [no need for further inquiry if no one has offered information that would give the court or [agency] reason to believe that a child might be an Indian child]; *In re H.V.*, at pp. 441–442 (dis. opn. of Baker, J.) [mother's and father's denials of Indian ancestry were substantial evidence to support juvenile court's finding that ICWA did not apply]; *In re S.B.* (2005) 130 Cal.App.4th 1148, 1161 ["as long as the social worker did inquire of the parents, and as long as the parents failed to provide any information requiring follow-up, [the social worker] had no further duty of inquiry"].)

We need not resolve this issue here because even were DCFS required to inquire further as to mother's ancestry, that duty was satisfied here. While the case was pending in the juvenile court, mother was given multiple opportunities to provide names and contact information for extended family members DCFS could have contacted, but she did not do so. As a result, the record does not identify any living members of mother's extended family, and on appeal she has not identified any specific individuals whom DCFS should have interviewed.[4]

---

[4] In her appellant's opening brief, mother asserts that DCFS should have interviewed the maternal grandmother, Dixie F. As DCFS notes, however, the record indicates that the maternal grandmother is deceased.

No further inquiry, thus, was possible or required. (E.g., *In re K.M.* (2009) 172 Cal.App.4th 115, 119 [where child protective agency "attempted on several occasions to elicit further information from the child's family, but was unsuccessful due to the family's hostility" toward the agency, the agency "did all that can or should be reasonably expected of it to meet its obligation to the child, to the family, to the tribes and to the court"]; *In re Levi U.* (2000) 78 Cal.App.4th 191, 199 [child protective agency is not required to conduct an extensive independent investigation or to "cast about" for investigative leads].)

Although mother concedes there is no indication in the present record that the children had Indian ancestry through her mother's family, she urges that this court should *assume* she has extended family members who could provide additional information regarding her possible Indian ancestry—and, further, that we should reverse the order terminating parental rights because the juvenile court failed to order DCFS to interview these still-unidentified individuals. We decline to do so. The kind of inquiry mother advocates is amorphous and lacks a defined stopping point at which DCFS can reliably conclude that it has done enough to establish the absence of Indian ancestry. And, of course, requiring DCFS to run down unpromising leads comes at a significant cost in terms of protecting the welfare of dependent children.

Where, as here, a parent largely fails to cooperate with DCFS or to provide names and contact information for extended family members, DCFS's ability to conduct an exhaustive ICWA inquiry necessarily is constrained. Although it is well established that the duty to develop information bearing on whether a child is an Indian child "rests with the court and the Department, not

16

the parents or members of the parents' families" (*In re Antonio R., supra,* 76 Cal.App.5th at p. 430), in most cases the court and DCFS cannot satisfy this duty without the participation of the parents. While we believe it reasonable in many cases to require DCFS to follow up on leads provided by the parents, we cannot ask the agency to intuit the names of unidentified family members or to interview individuals for whom no contact information has been provided. The juvenile court did not err by so concluding.

## B. Substantial evidence supported the juvenile court's finding as to father.

Mother also contends that DCFS did not conduct an adequate further inquiry into father's claimed Cherokee heritage because the record "contains no evidence of any inquiry made of any relatives or extended family members, even though father had advised the court that family members in Louisiana would be best situated to provide further information." Again, we disagree.

Father advised the court at the detention hearing that he might have Indian ancestry through a Cherokee tribe, but he did not provide the court with any additional information. Subsequently, he told DCFS that he did not have Indian heritage "and that he has said no before when he was asked that question." Father thereafter refused to cooperate with DCFS: He declined to meet with the CSW to fill out an ICWA form, which would have provided information regarding extended family members, if any; he did not respond to DCFS's phone calls or text messages; and he did not return ICWA-030 forms mailed to him at various addresses.

17

Mother does not contend that DCFS made inadequate attempts to contact father to obtain additional ICWA information, but she urges DCFS should have made ICWA inquiries of father's "family members in Louisiana" because father's statement that he might have Indian ancestry triggered a "reason to believe" the children were Indian children. As an initial matter, we are not persuaded that father's disclosure at the detention hearing created a "reason to believe" as defined by section 224.2, subdivision (e)(1): Although father stated at that hearing that he might have Cherokee ancestry, he later disavowed this statement, saying he did *not* have Indian ancestry and that he had "said no before when he was asked that question." Under these unique facts, we are not persuaded that father's statement at the detention hearing gave rise to "reason to believe" the children were Indian children.

In any event, even if father's statement did trigger a duty of further inquiry, substantial evidence supported the juvenile court's finding that the duty was satisfied here. While father's counsel said at the detention hearing that father had "family" in Louisiana, father specifically identified just two paternal relatives—the paternal grandmother and a paternal aunt. Father appears not to have provided contact information for the paternal grandmother, and the telephone number he provided for the paternal aunt was not in service.[5] Moreover, although DCFS made repeated efforts to contact the parents to obtain additional

---

[5]    Mother faults DCFS for making just one attempt to call the paternal aunt. Since the number provided for the aunt was not in service, it is not clear what purpose would have been served by trying the number multiple times.

information about these and other extended family members, neither parent ever provided that information. Under these circumstances, the juvenile court did not err by concluding that DCFS conducted "proper and adequate due diligence" with regard to the children's possible Indian ancestry, and there was no reason to know whether the children were Indian children. (§ 224.2, subd. (i)(2).)

Notwithstanding the parents' failure to provide DCFS with information about father's extended family members, mother contends the juvenile court should have required DCFS to make additional efforts to contact the paternal aunt and grandmother. We do not agree. Because no members of the parents' extended families ever appeared at a hearing (compare with *Antonio R.*, *supra*, 76 Cal.App.5th at p. 428), DCFS could have obtained names and contact information for paternal relatives only through mother or father—and the parents were either unable or unwilling to provide that information. Without reliable contact information, DCFS could not reasonably have been expected to interview extended family members. (See, e.g., *In re A.M.*, *supra*, 47 Cal.App.5th at p. 323 [although information provided by mother triggered a duty of further inquiry, agency's failure to interview maternal relatives was reasonable where mother could not provide information about maternal relatives and no maternal relative appeared at any hearing or participated in the matter; ICWA "does not obligate the court or [the Department] 'to cast about' for investigative leads"]; *In re C.Y.* (2012) 208 Cal.App.4th 34, 40 [although mother's statement triggered a duty of further inquiry, that duty did not include investigating mother's sealed and unsealed adoption records: "[Department] must inquire as to [possible] Indian ancestry and act on any

19

information it receives, but it has no duty to conduct an extensive independent investigation for information"].)  The juvenile court did not err in so concluding.

Finally, mother contends the notices DCFS mailed to the tribes were inadequate because they did not provide complete information (names, current and former address, birth and death dates, birth places, and tribal enrollment information) for the children's direct lineal ancestors.  Not so.  ICWA notice is required only if after initial and further inquiries there is "reason to *know*" that an Indian child is involved in the proceeding. (§ 224.2, subd. (f), italics added.)  As we have described, there is "reason to know" a child is an Indian child if any one of six statutory criteria is met—e.g., if the court is advised that the child is a member or eligible for membership in an Indian tribe, the child's or parent's residence is on a reservation, the child is or has been a ward of a tribal court, or either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe.  (*Id*., subd. (d).)  Here, none of these statutory criteria was met, and thus ICWA notice was not required.  Any insufficiencies in the notices sent, therefore, were legally irrelevant.

## DISPOSITION

The orders terminating parental rights are affirmed.


EDMON, P. J.

We concur:



LAVIN, J.



EGERTON, J.

Filed 6/16/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Q.M. et al., Persons Coming Under the Juvenile Court Law.<br><br>_____<br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PAMELA M.,<br><br>    Defendant and Appellant. | B313171<br><br>(Los Angeles County Super. Ct. No. DK12546C-D)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION<br>[NO CHANGE IN JUDGMENT] |

    THE COURT:

    The opinion in the above-referenced matter filed May 18, 2022, was not certified for publication in the Official Reports. For good cause shown it now appears that the opinion should be published in the Official Reports.

    [There is no change in the judgment.]


_____

EDMON, P.J.          LAVIN, J.          EGERTON, J.